1. The panel in this case issued its opinion and judgment May 22, 1987, ordering a new trial on damages alone. *Rakovich v. Wade*, 819 F.2d 1393 (7th Cir.1987). In an order dated August

George RAKOVICH, Plaintiff–Appellee,

v.

Gregory WADE and Darryl Drake, Defendants–Appellants.

George RAKOVICH, Plaintiff–Appellee,

v.

Chester KASS, Defendant–Appellant.

Nos. 85–1529, 85–1530.

United States Court of Appeals, Seventh Circuit.

Reheard En Banc Sept. 15, 1987 [1].

Decided June 8, 1988.

Rehearing En Banc Denied July 14, 1988.

25, 1987, 850 F.2d 1179, this court vacated the opinion and judgment and granted the petition for rehearing and suggestion for rehearing *en banc*.

Ronald L. Piette, Piette, Knoll & Nelson, S.C., Milwaukee, Wis., for defendants-appellants.

Michael O. Bohren, Marola & Bohren, Milwaukee, Wis., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Following a burglary at Cars Unlimited, a used car business in Greenfield, Wisconsin, the plaintiff, George Rakovich, met several times with burglary witness and Cars Unlimited employee, Vincent Sheehan. Concerned with what he viewed as the Greenfield Police Department's (the Department) suspect commendation of Officer Mary Foley's efforts in the subsequent burglary arrests, Rakovich criticized the Department and informed Sheehan of a "source" he claimed he had within the Department. From that source, he told Sheehan, he had learned the Greenfield Police Department was investigating Sheehan. The Department did begin an investigation on its own of the propriety of the commendation following a press account questioning the commendation. Members of the Department in pursuing that investigation discovered Rakovich's activities, believed they may have been criminal, and presented the investigation results to Assistant District Attorney Crivello. Crivello called a charging conference,[2] which was reported in the local newspaper. Ultimately Crivello did not file criminal charges against Rakovich. Believing that his reputation had

been injured and that the Department, its individual members, and others had acted merely in retaliation for his criticisms and past disagreements with the Department and with them, Rakovich brought this 42 U.S.C. § 1983 action against various defendants including the appellants here, Greenfield Police Chief Chester Kass and Greenfield Officers Gregory Wade and Darryl Drake (the officers).

There are two primary issues to be considered: 1) Judged by the standard set out in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), did an intent to retaliate against Rakovich for activities protected by the first amendment *motivate* the officers; and 2) Are the officers *qualifiedly immune* under the standards set out in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)?[3]

## I. BACKGROUND

It is necessary to explore the evidence in more detail. Two men burglarized Cars Unlimited on July 21, 1981. Vincent Sheehan, a Cars Unlimited employee, observed the burglary in progress and reported it to the Greenfield Police Department. The Greenfield Police Department contacted the Greendale Police Department under a reciprocal assistance arrangement, asking that Greendale dispatch an officer to Cars Unlimited. Greendale Officer William Meyers and Greenfield Officer Mary Foley responded and arrested the suspected bur-

---

**2.** This is a Milwaukee County procedure in which the District Attorney assembles interested parties, including a criminal suspect, for questioning so that he has more complete information to aid in his decision whether or not to file criminal charges against the suspect. *See supra* Part II, section B, subsection 2.

**3.** We will discuss the officers' motivation first and the immunity question second. In a more typical case it might be more prudent initially to address the immunity question because the immunity question normally is raised in a summary judgment motion early in the proceeding,

and any substantive controverted factual issues in the case, such as the officers' motivation, cannot be determined until sometime later in the proceeding. Thus, a decision on summary judgment may moot any need to address the substantive issues. But, here the immunity issue and the substantive issues were both raised for the first time in a motion for directed verdict and each provides an equally persuasive alternative supporting the outcome. In this situation there is no significance in the order we choose; it simply is convenient for our analysis.

glars. Based on another witness's report of the incident, Foley received a Department commendation. Meyers received nothing. Meyers complained to the Greendale Department concerning the propriety of the award, apparently believing that the commendation made it appear that only Foley had apprehended the burglars. Articles discussing the commendation appeared in two newspapers, the *Greenfield Observer* and the *Milwaukee Journal.* Both the Greenfield and Greendale police departments decided to investigate the circumstances of the burglary arrest.

The Greenfield investigation began August 24; the intent of the investigation was to clarify the respective roles of Meyers and Foley in the burglary arrest, which would serve as the basis for evaluating the propriety of the Foley commendation. With this in mind, Chester Kass, Greenfield Police Chief, assigned Detective Gregory Wade and Sergeant Darryl Drake to the Greenfield investigation. Those three are the defendants-appellants here. In the course of their investigation Drake and Wade interviewed Sheehan numerous times. At the initial interview, September 3, Sheehan described the burglary and arrest. He told the officers that a Greenfield Officer, Charles Salbashian (it appears Sheehan may have incorrectly believed originally that Salbashian was a Greendale officer), and an unidentified man had previously questioned him about the burglary. The unidentified man had been critical of Foley, claiming she had received the commendation solely because her father was a judge. This questioning and criticism occurred August 9. Wade and Drake believed that possibly the unidentified man was another police officer. They reported this information to their superior, Lt. Kaczkowski, and to Kass. Kass instructed them to continue the investigation and to consult with Assistant District Attorney Crivello, who was assigned to the prosecution of the burglars. At a September 8 meeting Crivello instructed Wade and Drake to discover the identity of the unidentified man, as he concluded that someone was tampering with the state's witness. Neither the officers, Wade, Drake, or Kass, nor Crivello yet knew that plaintiff Rakovich was the unidentified man.

Later that same day, September 8, Drake and Wade again met with Sheehan and learned that the unidentified man was Rakovich, a member of the Greenfield Civil Service Commission. Sheehan told Drake and Wade that Salbashian and Rakovich (Salbashian and Rakovich were close personal friends) had visited him a second time, August 23, and that Rakovich alone had visited once, September 8. Sheehan described the conversation at the first meeting, in which Rakovich or Salbashian stated that they had a friend at the *Greenfield Observer,* who would contact Sheehan. At the second meeting, Rakovich asked Sheehan if his newspaper friend had made contact. At the second meeting Rakovich also stated that he had a source of information in the Greenfield Police Department, implying that this source had told him that the Department was also checking out Sheehan. Further, Sheehan was advised by Rakovich that he could sue the Department for undertaking such an investigation. Lastly, Rakovich complained to Sheehan that Foley could not do the job because she was a woman, and the Department was covering up the controversy surrounding the commendation. At the conclusion of this September 8 meeting, around 7:00 p.m., Drake and Wade contacted Kass at home and informed him about the apparent information leak. Kass told them to continue the investigation, and to continue working with Crivello because "he felt that a leak in the department strikes at the integrity of the department and that he could not ignore or condone such conduct." In an attempt to track down the leak, Kass, Drake, and Wade planned to place false information in each others' mailboxes at the Greenfield police station to see if and where the false information might later surface. They did so on September 9.

On September 13 Sheehan called and told Wade of his September 12 meeting with Rakovich. Wade had secretly photographed Rakovich's September 12 visit to the Cars Unlimited lot. Sheehan, Wade, and possibly Drake, met that evening.

Sheehan stated that Rakovich had again claimed he had a source in the Department and encouraged Sheehan to bring a suit for police harassment.

On September 17, Drake, Wade, and Foley met with Assistant District Attorney Crivello, at which time Crivello advised that he would have Robert Scopoline, a sergeant in the Milwaukee County Sheriff's Department, interview Rakovich. Wade and Drake left a report of their investigation with Crivello. When they returned to the station following this meeting they found that Sheehan had left a message. Rakovich had again visited Sheehan, and Drake and Wade arranged to meet with Sheehan later that same day. At this meeting, Sheehan told of Rakovich's latest reference to his source and of Rakovich's revelation that the Department was gathering information about Sheehan's criminal and naval records. This information was similar to the information the officers planted to track down the leak. Rakovich had also suggested that Sheehan accompany an attorney and a media representative to the police station to demand any report concerning Sheehan. In addition, Rakovich offered Sheehan money, fifty dollars or less, so he could hire an attorney named "Mike." If Kass failed to supply Sheehan with a report, Rakovich said his source could get him a copy.

On September 18, Wade, Drake, and Crivello met with Scopoline who later interviewed Rakovich on September 21. After the interview, still that same day, Drake, Wade, and Scopoline met again. This meeting was followed by another meeting attended by Drake, Wade, and Crivello. Crivello ordered a charging conference

held, in which Salbashian and Rakovich were to be given the opportunity to explain their activities with Sheehan. Rakovich learned of this conference in a September 21, 1981, *Milwaukee Journal* article, which stated nothing more than that Rakovich was being ordered to the District Attorney's Office "for a charging conference for criminal charges." A September 23 article in the same newspaper indicated Rakovich had yet to receive a summons or notice of any kind. Several days after the second article appeared he, as well as Salbashian, received a notice to appear for the conference. Prior to the conference, on September 22, Sheehan left a message for Wade, requesting that he contact him. Drake and Wade met with Sheehan the next day. Sheehan told them that Rakovich and Salbashian had slowly driven by Cars Unlimited twice on the night of September 21, and he feared that they might confront and "hassle" him. He also told of receiving an anonymous call on September 23, in which the caller said "you're dead," and hung up. Also prior to the charging conference, Kass sent Crivello a letter, dated October 12, 1981, in which he complained of Salbashian's and Rakovich's conduct.

Crivello, Rakovich, Salbashian, Drake, Foley, and Foley's attorney attended the October 16 charging conference. Apparently Wade acted as spokesperson on behalf of the Department and presented Crivello with at least several, if not all, of the following statutes, which it was believed Rakovich may have violated: Wis.Stat.Ann. § 134.01 (West 1982) (injury to business; restraint of will);[4] Wis.Stat.Ann. § 942.01 (West 1982) (defamation);[5] Wis.Stat.Ann.

---

4. Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500.
Wis.Stat.Ann. § 134.01 (West 1982).

5. (1) Whoever with intent to defame communicates any defamatory matter to a third person without the consent of the person defamed is guilty of a Class A misdemeanor.
(2) Defamatory matter is anything which exposes the other to hatred, contempt, ridicule, degradation or disgrace in society or injury in his business or occupation.
(3) This section does not apply if the defamatory matter was true and was communicated with good motives and for justifiable ends or if the communication was otherwise privileged.

§ 946.12 (West 1982) (misconduct in public office); [6] and Wis.Stat.Ann. § 946.47 (West 1982) (harboring or aiding felons).[7] Crivello also considered Wis.Stat.Ann. § 943.30 (West 1982) (attempt to influence a witness).[8]

Crivello took the matter under advisement. An October 22, 1981, story in the *Greenfield Observer* stated that "the District Attorney was reviewing the complaint against Rakovich." Shortly thereafter Crivello decided not to charge Salbashian or Rakovich. In a December 7, 1981, letter to Wade, Crivello concluded that the activities of Salbashian and Rakovich did not fall within the prohibitions of the criminal statutes although they may be disturbing from an internal police point of view and may be the subject of appropriate internal action by the Greenfield Police Department and the City of Greenfield.

Claiming that the investigation, charging conference, and attendant publicity were improperly motivated and had caused an

(4) No person shall be convicted on the basis of an oral communication of defamatory matter except upon the testimony of 2 other persons that they heard and understood the oral statement as defamatory or upon a plea of guilty or no contest.
Wis.Stat.Ann. § 942.01 (West 1982).

6. Any public officer or public employee who does any of the following is guilty of a Class E felony:
(1) Intentionally fails or refuses to perform a known mandatory, nondiscretionary, ministerial duty of his office or employment within the time or in the manner required by law; or
(2) In his capacity as such officer or employee, does an act which he knows is in excess of his lawful authority or which he knows he is forbidden by law to do in his official capacity; or
(3) Whether by act of commission or omission, in his capacity as such officer or employee exercises a discretionary power in a manner inconsistent with the duties of his office or employment or the rights of others and with intent to obtain a dishonest advantage for himself or another; or
(4) In his capacity as such officer or employee, makes an entry in an account or record book or return, certificate, report or statement which in a material respect he intentionally falsifies; or
(5) Under color of his office or employment, intentionally solicits or accepts for the performance of any service or duty anything of value which he knows is greater or less than is fixed by law.
Wis.Stat.Ann. § 946.12 (West 1982).

7. (1) Whoever does either of the following is guilty of a Class E felony:
(a) With intent to prevent the apprehension of a felon, harbors or aids him; or
(b) With intent to prevent the apprehension, prosecution or conviction of a felon, destroys, alters, hides, or disguises physical evidence or places false evidence.
(2) As used in this section "felon" means either of the following:
(a) A person who commits an act within the jurisdiction of this state which constitutes a felony under the law of this state; or

(b) A person who commits an act within the jurisdiction of another state which is punishable by imprisonment for one year or more in a state prison or penitentiary under the law of that state and would, if committed in this state, constitute a felony under the law of this state.
(3) This section does not apply to the felon or his spouse, parent, grandparent, child, grandchild, brother or sister by consanguinity or affinity of such felon.
Wis.Stat.Ann. § 946.47 (West 1982).

8. (1) Whoever, either verbally or by any written or printed communication, maliciously threatens to accuse or accuses another of any crime or offense, or threatens or commits any injury to the person, property, business, profession, calling or trade, or the profits and income of any business, profession, calling or trade of another, with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do any act against the person's will or omit to do any lawful act, is guilty of a Class D felony.
(2) Whoever violates sub. (1) by obstructing, delaying or affecting commerce or business or the government of any article or commodity in commerce or business is guilty of a Class D felony.
(3)(a) Whoever violates sub. (1) by attempting to influence any witness in any matter, cause, action or proceeding before any court, officer or body mentioned in s. 946.31(1), or any petit or grand juror, in the performance of his or her functions as such, or to deter any such witness from testifying, is guilty of a Class D felony.
(b) In this subsection "witness" means any person who has been or is expected to be summoned to testify, or who by reason of having relevant information is subject to call or likely to be called as a witness, whether or not any action or proceeding has as yet been commenced.
(4) Whoever violates sub. (1) by attempting to influence the official action of any public officer is guilty of a Class D felony.
Wis.Stat.Ann. § 943.30 (West 1982), *amended by* Wis.Stat.Ann. § 943.30(3) (West Supp.1987).

injury of constitutional dimensions, Rakovich, on March 3, 1982, commenced a section 1983 action against Wade, Drake, Foley, and the City of Greenfield. 42 U.S.C. § 1983. On April 18, 1983, Rakovich filed a separate but similar suit naming Kass and Greenfield Mayor Francis P. Havey as defendants. The district court dismissed the City of Greenfield from the initial suit, and consolidated the two cases. At trial the parties stipulated to the dismissal of Foley. At the close of the evidence the defendants moved for a directed verdict, which was granted as to defendant Havey. In another motion for directed verdict the officers argued that Rakovich had not been deprived of any constitutional right and that they were shielded from liability because of absolute or qualified immunity. The trial court apparently denied that motion, but indicated it would consider the issues again later in the proceeding. The jury reached a general verdict against Kass, Wade, and Drake, awarding compensatory damages totaling $50,000 and punitive damages totaling $90,000, $25,000 each against Wade and Drake and $40,000 against Kass. The officers filed several post-verdict motions, including a motion for judgment notwithstanding the verdict, grounded both on the failure to make out a constitutional claim and immunity issues. Also filed was a motion to amend the verdict to strike the compensatory and punitive damages. Alternatively, the defendants asked the court to remit the damages to $0.00 or grant a new trial, on the grounds that the damages were excessive. The district court denied the motions and granted Rakovich's motion for attorney's fees.

The officers raise five issues on appeal: 1) Rakovich failed to prove that the officers abridged his first amendment rights; therefore, the district court erred when it denied the officers' motion for directed verdict and motion for judgment notwithstanding the verdict; 2) a "quasi-judicial absolute immunity" or a "good faith qualified immunity" shields the officers from liability; therefore, the district court erred when it denied the officers' motion for directed verdict and motion for judgment notwith-

standing the verdict; 3) Rakovich failed to prove actual damages; therefore, the district court erred when it denied the motion to strike the actual damage awards; 4) Rakovich failed to prove "evil motive" or "reckless indifference"; therefore, the district court erred when it denied the motion to strike the punitive damage awards; 5) the damage awards were excessive; therefore, the trial court erred when it denied the motion for a new trial. Issues one and two, both in the directed verdict and judgment notwithstanding the verdict contexts, are dispositive of this appeal, mooting issues three through five, which therefore need not be addressed.

## II. DISCUSSION

### A. STANDARD OF REVIEW

The motions for a directed verdict and for a judgment notwithstanding the verdict are embodied in the same federal rule, Rule 50 of the Federal Rules of Civil Procedure. This is more than mere coincidence: the directed verdict and judgment notwithstanding the verdict determinations require the same analysis, merely undertaken at different points in the proceedings. These motions are judged by the same legal standard. *Valdes v. Karoll's, Inc.*, 277 F.2d 637, 638 (7th Cir.1960); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2524, at 542–42 (1971). In addition, this single standard applies both to the trial court's determination and the appellate court's review of the motions. 9 C. Wright & A. Miller, *id.* The connection extends to a requirement that the motion for judgment notwithstanding the verdict be preceded by a motion for a directed verdict, which must be sufficiently specific. Fed.R. Civ.P. 50(a); *Parts and Elec. Motors, Inc. v. Sterling Elec.*, 826 F.2d 712, 716 (7th Cir.1987); *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984). Motions for directed verdict and judgment notwithstanding the verdict are analyzed according to the same formulation:

We must determine whether the evidence justifies submission of the case to the jury. *Lambie v. Tibbits,* 7 Cir., 1959, 267 F.2d 902, 903. Such a motion should be

denied "where the evidence, along with all inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions." *Smith v. J.C. Penney Company*, 7 Cir., 1958, 261 F.2d 218, 219.

*Valdes*, 277 F.2d at 638. *Accord Benson v. Allphin*, 786 F.2d 268, 279 (7th Cir.) ("The standard for granting a directed verdict is very generous to the nonmovant. The trial court must view the evidence and make all inferences in the light most favorable to the nonmoving party, and if reasonable jurors could differ on the conclusions drawn therefrom, the case must go to the jury."), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986) (two petitions for certiorari denied, Nos. 86–27 and 86–29). "A directed verdict in favor of a defendant, then, is proper only if reasonable people, viewing the facts most favorably to the plaintiff and disregarding conflicting unfavorable testimony, could not conclude that the plaintiff has made out a prima facie case." *Crowder v. Lash*, 687 F.2d 996, 1002 (7th Cir.1982). "In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2524, at 543–44 (1971) (footnotes omitted). We use this standard, therefore, to conduct a *de novo* review of Rakovich's retaliation claim.

## B. MIXED MOTIVE—*MT. HEALTHY*

Rakovich claims he suffered an injury to his reputation resulting from infringement of his first amendment right to criticize or comment. In effect he claims the officers, Wade, Drake, and Kass, attempted to chill his freedom of expression. It is undisputed, however, that the initiation of the investigation was proper, and that Rakovich was unaware that the investigation might include him until the investigation's latter stages. As for the investigation's initiation, it is undisputed that the officers' first contact with Sheehan, on September 3, was proper; they were investigating the Mary Foley commendation and the respective role of the Greendale and Greenfield police departments in the burglary arrest. At the end of this meeting it was Sheehan who mentioned that several others had visited him regarding the same matter. It was not until Drake and Wade next interviewed Sheehan, on September 8, that they discovered that Rakovich was involved. Even Rakovich agrees that up until this point the officers did nothing violative of his rights.

As for Rakovich's awareness of the investigation, any chilling of rights could not have occurred, if at all, until late in the investigation when Scopoline interviewed Rakovich. At that time, aware for the first time that he was involved in the investigation, Rakovich may have arguably felt some inhibition regarding any further criticism. However, besides photographing him on September 12, which he was not aware of at the time, the officers did nothing claimed by Rakovich to be injurious to his reputation until they released the statement regarding the charging conference, and in some fashion participated in the decision to call the conference.

Thus, the humiliation associated with public disclosure of the charging conference and Rakovich's attendance at the conference were the only acts that might support a damage claim. The disclosure was the single statement that Rakovich was being called to the District Attorney's Office for a charging conference and possibly a later story stating the Assistant District Attorney had taken the charging conference information under advisement. Therefore, the propriety of the calling of the charging conference and the concomitant publicity are the focus of our first amendment discussion. Other portions of the investigation and the prior relationships of the officers and Rakovich serve as factors potentially relevant to the officers' state of mind.

Initially we determine if the alleged injury amounts to a constitutional deprivation cognizable under section 1983. 42 U.S.C. § 1983; *see, e.g., Crowder v. Lash*, 687

F.2d 996, 1002 (7th Cir.1982) ("To recover damages under 42 U.S.C. § 1983 a plaintiff must prove that the defendants acted under color of state law, that their actions resulted in a deprivation of the plaintiff's constitutional rights, and that the action of the defendants proximately caused the constitutional violation."). The officers argue that Rakovich complains of no more than an injury to reputation, an injury not cognizable as a constitutional claim under the teaching of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and *Schultz v. Baumgart*, 738 F.2d 231 (7th Cir.1984). The officers argue that the deprivation of a property or liberty interest must accompany the damaged reputation. Here, according to the officers, Rakovich suffered injury neither in his job nor in his business. The officers disagree with the district court's determination that the claimed damage to reputation was caused by retaliation for the exercise of first amendment rights and actionable under section 1983.

The officers' argument ignores that there are several configurations for stating a section 1983 claim, only one of which is the "injury to reputation that leads to a deprivation of a liberty or property" scheme. *See, e.g., Paul*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405. Another is that relied on by the district court: "retaliation against constitutionally protected activity that leads to an injury." *See, e.g., Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977); *Anderson v. Central Point School Dist. No. 6*, 746 F.2d 505 (9th Cir. 1984) (per curiam). The district court correctly found that an investigation conducted in retaliation for comments protected by the first amendment could be actionable under section 1983. The officers have not argued that the amendment is inapplicable. We need to consider if the officers retaliated against Rakovich because of his protected activities.

A review of the undisputed evidence shows that whatever retaliation there may have been, even in its later stages, was at most not the *sole* motivation of the investigation. To the contrary, a material part of the motivation for the investigation admittedly sprang only from proper law enforcement goals. What we potentially have is a mixed motive, part proper, part allegedly not, which requires an analysis of causation. In other words, the question becomes was retaliation for the exercise of first amendment rights the "cause" of the charging conference and attendant allegedly injurious publicity? "Causation" is a term of art unique to the inquiry before us. We will define it for this context.

In *Mt. Healthy*, 429 U.S. 274, 97 S.Ct. at 568, the Supreme Court set out the general approach to mixed-motive causation determinations:

> Initially, ... the burden was properly placed upon [the plaintiff] to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the [defendant's] decision not to rehire him. [Plaintiff] having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct.

*Id.* 429 U.S. at 287, 97 S.Ct. at 576 (footnote omitted). The plaintiff's burden of establishing that the substantial or motivating factor was retaliation is a *burden of persuasion*, which he must prove by a preponderance of the evidence. *See Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). The plaintiff's burden is not so facile that he can carry it by showing "only that elimination of the protected activity may have been welcomed by the defendant or even that such activity played some minor role in the discharge decision." *McClure v. Cywinski*, 686 F.2d 541, 546 (7th Cir.1982). *Cf. NLRB v. Transportation Management Corp.*, 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed. 2d 667 (1983) (in adopting the *Mt. Healthy* standard for improper discharge cases before the National Labor Relations Board, the Court characterized plaintiff's burden

as one of showing improper purpose "played a role"). Neither is it so burdensome that the plaintiff must show that the defendant's desire to inhibit protected conduct was the sole motive for his actions. *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 264–66, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977); *Nekolny,* 653 F.2d at 1168. In fact, the plaintiff need not even go as far as showing that "a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. at 563. This court has stated that, in order to carry his or her burden, the plaintiff must show *"had it not been for the violation,* the injury of which he complains would not have occurred...." *Button v. Harden,* 814 F.2d 382, 383 (7th Cir.1987) (emphasis added). *Accord Board of Education v. Pico,* 457 U.S. 853, 871 n. 22, 102 S.Ct. 2799, 2810 n. 22, 73 L.Ed.2d 435 (1981) (plurality) (The improper motive must have been the decisive factor. "By 'decisive factor' we mean a 'substantial factor' *in the absence of which* the opposite decision would have been reached. *See Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)." (emphasis added)). Whether or not these several definitions differ to any significant degree and irrespective of the particular language used, the plaintiff's burden is not insubstantial. We shall examine three Seventh Circuit opinions to guide our determination of the type of evidence that suffices to meet the "motivated" or "substantial" burden in the directed verdict or judgment notwithstanding the verdict contexts.

In *Endicott v. Huddleston,* 644 F.2d 1208 (7th Cir.1980), this court reviewed the district court's granting of defendant Huddleston's motion for judgment notwithstanding the verdict. We held that the plaintiff Endicott had not carried his *Mt. Healthy* burden of showing that a constitutionally protected action served as a "motivating factor" in Huddleston's decision to terminate his employment in September of 1974:

> In the instant case, all Endicott has shown is that he is a Democrat and that the defendants are Republicans, that

there were numerous conflicts between himself and the Board, and that as early as 1972 two of the defendant Board members wished to remove him from office. Even drawing all reasonable inferences from the evidence viewed in the light most favorable to plaintiff, we conclude there was insufficient evidence from which a jury could find that the defendants' actions were motivated by political considerations.

*Id.* at 1215 (footnote omitted).

In *Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.1981), this time in the directed verdict context, two of the plaintiffs testified that an aide to the defendant Painter had told them they were fired because they had campaigned for Painter's opponent in a very recent political campaign. The aide denied the allegation. Painter argued that the termination was no more than a fulfillment of a campaign promise to eliminate several high paying positions within the township government, although it was undisputed that Painter refilled one of the positions, albeit at a reduced salary. In considering *Mt. Healthy,* the *Nekolny* court stated that "[a] disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." *Id.* at 1168. However, the court went on to hold that the evidence before it was sufficient to permit the jury to decide the issue. Additionally, the court was not convinced that the evidence was insufficient to support the findings of the jury, opining that although much of the plaintiffs' evidence was controverted, "issues of credibility are for the jury to decide." *Id.* at 1169 n. 2 (citing *Hampton v. Hanrahan,* 600 F.2d 600, 625 (7th Cir.1979), *rev'd in part,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980)).

In *McClure v. Cywinski,* 686 F.2d 541 (7th Cir.1982), in agreeing that the district court's granting of the defendant's motion for judgment notwithstanding the verdict was correct, this court stated the following:

The phone conversation in which Cywinski reportedly referred to McClure as "window dressing" while, in the same breath, stating that Kathy Makos was okay and was a senator's friend occurred three and a half months before McClure's discharge. This lapse of time severely undercuts the weight we might otherwise attribute to this phone conversation. Although we see no clear explanation as to why McClure was given few work assignments by Cywinski, we also see no direct evidence that a distaste for McClure's attitude toward politics was the reason. We also think it relevant that Cywinski was well aware of McClure's attitudes toward politics at the time he hired the plaintiff....

... On balance, we think the above pattern of events is at most sufficient only to create an inference that Cywinski preferred working with employees who were politically motivated. Whether Cywinski would have *discharged* McClure because of his apolitical attitude is another question. The line between a reasonable inference and "speculation" is not a clear one, but we think that the district judge correctly concluded that no reasonable juror could find that McClure proved that his protected activity was a *motivating* factor in his discharge.

*Id.* at 546–47 (emphasis in original). In his concurrence, Judge Cudahy disagreed with the majority's decision that Cywinski had not carried his burden and reasoned that, although the evidence was minimal, the plaintiff provided evidence sufficient to show that protected activity motivated the discharge. *Id.* at 550 (Cudahy, J., concurring).[9]

■ In broad terms *Endicott* indicates that a difference in political affiliation alone is not enough to show improper motivation. *Nekolny* agrees with this premise and adds that support of defendant's opponent in an election is also not enough. *Nekolny* does indicate, however, that direct testimony that the defendant fired plaintiff because of plaintiff's support of an opposing candidate is enough to survive a motion for directed verdict. *McClure* teaches that a defendant's negative comments too far removed (more than three and one-half months prior to the termination) from the complained of deprivation, accompanied by evidence that the defendant knew of the activities he allegedly disliked at the time he hired the plaintiff, is not enough to show improper motivation. These cases also stand for the important proposition that, in the directed verdict and judgment notwithstanding the verdict contexts, evidence of some disagreement or dislike must be accompanied by evidence linking it to the injury. More than mere speculation must serve as the basis for finding that such disagreement is the "motivating cause." If this link is not made a reasonable jury could not find that the disagreement "motivated" the defendant; thus, the defendant should prevail on the motion.

We have carefully reviewed the nearly 1,300 pages of transcripts and the several hundred pages of the record in search of material relevant to the *Mt. Healthy* inquiry. Arguing the import of various portions of the record to the specific nuances of the case law is a party responsibility, but this record is void of any explicit mention or application of this test. *See, e.g., Ohio Casualty Ins. Co. v. Bazzi Constr.,* 815 F.2d 1146, 1149 (7th Cir.1987) ("This

9. This circuit reviewed jury verdicts in two other cases and determined whether the plaintiff had carried his burden of demonstrating that his protected activity "motivated" the defendants' actions. In *Knapp v. Whitaker,* 757 F.2d 827, 843–44 (7th Cir.), *appeal dismissed and cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985), this court upheld the jury's verdict that the plaintiff had shown the defendants' actions were motivated by the protected activity. The jury's decision was supported by evidence that plaintiff was removed from his coaching position, transferred to another school, denied a personal day to visit his attorney, reprimanded, and negatively evaluated, all at a time when the defendants believed plaintiff was inappropriately communicating with the school board.

Likewise, in *Perry v. Larson,* 794 F.2d 279, 283 (7th Cir.1986), again upholding a jury verdict, this court relied on evidence that the plaintiff was threatened, suspended without a hearing for five days, chastised by letter for being one minute late, offered reinstatement in exchange for giving up campaign plans, all after the plaintiff had announced his political candidacy.

court has repeatedly held that if a party fails to press an issue before the district court, he waives the right to present that argument on appeal."). However, the failure to argue *Mt. Healthy* in the district court will not impair our review as long as the necessary issues were properly raised in the motion for directed verdict or motion for judgment notwithstanding the verdict. Rakovich argued that he was injured because he spoke out against the Department. The parameters of the argument were clearly set: were the officers' intentions in participating in the investigation, charging conference, and information release to retaliate for protected activities? There was evidence presented, both demonstrating legitimate and possible non-legitimate reasons for the officers' actions. Clearly, a mixed-motive situation, whether or not it was labelled such, was framed and decided by the trial court in ruling on the motions. The effect of the district court's application of the law on the outcome of the case is a legal question reviewed *de novo* by the appellate court. We are bound to apply the pertinent law. *See Toney v. Burris*, 829 F.2d 622, 626 (7th Cir.1987) ("[T]he waiver rule does not apply to the law on which a decision is based.").

■ Further, we point out that the instructions to the jury, which were not objected to, did not precisely conform to the *Mt. Healthy* test. Instructions not objected to become the "law of the case," a limited doctrine that can affect our decision regarding a motion for judgment notwithstanding the verdict. *See Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 675 (7th Cir.1985). Here if the instructions given in the district court state the law of the case for purposes of the judgment notwithstanding the verdict determination, we cannot apply law at odds with those instructions. Our focus, however, is not on the reasonableness of this jury's evaluation of the evidence. The instructions given as a matter of law were not entirely complete.

Those instructions required, among other things, that the jury consider both the evidence of retaliation and the evidence of legitimate reasons for acting in similar situations. For example, the instructions stated that it is unlawful to "harass or stigmatize any citizen *solely* in retaliation for engaging in activity protected by the United States Constitution." (Emphasis added). Conversely, "police officers are under a duty imposed by law to investigate any individual who, without apparent cause, revisits the scene of a burglary and questions the state's witness about the burglary." These instructions though incomplete do contain the essence of what *Mt. Healthy* sets out for mixed-motive cases. The instructions did not clearly allocate evidentiary burdens as did *Mt. Healthy*, but that is not of primary concern. It does not stretch the law of the case rationale to equate the instructions and the first part of the *Mt. Healthy* inquiry. We still must consider the same question: did retaliation motivate the officers?

*Mt. Healthy* and its progeny must guide our decision as to the meaning of motivation; even a very expansive reading of the law of the case doctrine does not preclude definition of the language used in the jury instructions, when not inconsistent. *Mt. Healthy* is not at odds with the jury instructions. In any event, we will style our analysis of this mixed-motive case along *Mt. Healthy* lines because the issue of retaliation was preserved during trial and the evidence regarding intent well-developed in the record.

### 1. Animosity

There was some testimony regarding animosity between Rakovich and the officers. Reporter Nancy Allan testified that the local Greenfield paper had reported on a court case between Officer Salbashian and Chief Kass:

Kass had sued him for a form of harassment that was very common knowledge. But there was no love lost between the two of them.

. . . .

There was one small incident involving Mr. Rakovich and Chief Kass when Mr. Rakovich was on our auxiliary police force that happened during a Fire and Police Commission meeting. It involved

—Mr. Rakovich resigned from the auxiliary police and it involved the keeping of his badge. There were some harsh words exchanged on that.

During the Rakovich testimony, after Rakovich testified that he "had a few disputes" with Kass, the court sustained the officers' objection to testimony regarding "the nature of those disputes." In an offer of proof made outside the jury's presence, Rakovich's counsel argued that such testimony was proper because "it shows motivation for any actions the Chief would have pursued with the investigation of George Rakovich in 1981." The proposed testimony was that Rakovich had filed a complaint against Kass in 1977, which had led to Kass's reprimand. The court allowed into evidence that a complaint had been filed, but declined to explore the details. However, Rakovich also testified, as did others, that Mayor Havey, initially a defendant in this lawsuit, reappointed Rakovich to the Greenfield Civil Service Commission in May of 1981, subsequent to both the 1977 complaint and to Rakovich's support of Havey's opponent in the mayoral campaign and election.

As to Salbashian, not a party to this action, Detective Krukowski, a member of the Greenfield Police Department, testified that "[b]ased on my personal observation I would say there's been a conflict over a period of years between the Chief and Charles Salbashian." In testifying why, after accompanying Rakovich in the initial meetings with Sheehan, he did not want any further involvement in the continued questioning of Sheehan, Salbashian testified that he had had problems with the department and with Kass, so he stayed clear of matters that concerned Kass or friends of his such as Mary Foley.

Besides very general statements regarding "problems" between Kass and Rakovich and between Kass and Salbashian there was absolutely no direct or current evidence of animosity. Rakovich would like this court to speculate that those alleged past disagreements motivated the officers. However, none of the evidence *directly* relates to any historical animosity between Rakovich and Wade or between Rakovich and Drake. Moreover, specific incidents cited were from 1977, some four years before the occurrence of the acts upon which this case is predicated. Further, the evidence fails directly to relate the alleged animosity with the complained of acts of the officers. The bare allegation that Rakovich supported Havey's opponent in an election will not suffice. No one has testified that the officers investigated Rakovich *because* they did not like him or his opposition to their politics, only that the parties may not have liked each other. Finally, even though this is not a case of wrongful termination, it is relevant that Havey reappointed Rakovich to the Civil Service Commission after most of the difficulties leading up to the allegedly improper actions of the officers had already occurred.

■ Importantly, those prior disagreements are not independently significant in that they concern behavior that is itself protected by the first amendment. They are significant only as they may relate to the officers' state of mind. As to state of mind, the probative value of these disagreements is, however, weakened when the nature of the cause of action is reiterated: retaliation for the exercise of first amendment rights, and not simply retaliation because the officers had a generic dislike of Rakovich. Any finding of a genesis of the complained of conduct in such stale and general disagreements could only be the result of mere speculation. Additional direct evidence would be needed before an improper retaliatory motivation could be inferred. Guided by the evaluations of facts from the opinions of this court already discussed, it is clear that the animosity evidence, even when viewed in the light most favorable to Rakovich, fails to show that the officers in their investigation were "motivated" by Rakovich's protected actions.

### 2. Charging Conference

Rakovich also argues that the officers manipulated Assistant District Attorney Crivello into holding a charging conference

when they knew no cause justified such a conference. In his testimony Crivello described the Milwaukee County charging conference. He explained that during the pendency of an investigation, like that involving Rakovich, where the District Attorney handling the case wishes to determine the investigation's progress or to determine whether crimes may have been committed, he or she orders a charging conference held. According to Crivello, the District Attorney directs the investigating officers to order all of the people involved to come to the District Attorney's Office. He pointed out that many charging conferences, but not all, result in the filing of criminal charges against the subject of the investigation. Crivello added that the conferences are open to the public. In about fifty percent of the conferences officers do suggest that certain charges be issued. Also, Crivello added the following:

> [o]fficers investigate suspected criminal activity. In issuing charges I decide whether or not that activity or alleged activity can be proven. First of all whether or not it occurred and second whether or not it can be proven beyond a reasonable doubt.... I am operating on a much different level than investigating officers are.

*Defense of Criminal Cases in Wisconsin,* a publication of the University of Wisconsin Extension Department of Law, similarly describes the Milwaukee County charging conference. V. Knoppke–Wetzel & Committee of Co–Authors and Advisers, *Defense of Criminal Cases in Wisconsin* § 2.3 (1974). To Crivello's description it adds that the "prosecutor's decision will rest upon many factors, including the strength of the evidence, likely attitudes and sympathies of judges and juries, police misconduct or ineptitude, the defendant's past record and factual weaknesses in the case." *Id.* at 2–6, 2–7. Moreover, it is advised that the presence of defense counsel can lessen the influence of the police and present necessary favorable information to avoid the actual filing of charges. *Id.* § 2.3. To take full advantage of the opportunity the potential defendant or his or her counsel must become familiar with the relevant statutes and ordinances and demonstrate their inapplicability, and possibly negotiate for lesser charges or for some other alternative short of the filing of charges. *Id.*

■ We find Rakovich's argument that the officers forced or manipulated Assistant District Attorney Crivello into calling the conference totally meritless. Once again we see no direct link between the officers' actions and retaliatory motive. Drake testified that Crivello said he wanted Rakovich ordered in and it was then that the charging conference was scheduled. Drake added that "[m]y recollection of the [September 21, 1981] meeting is that we had advised [Crivello] that there [were] again numerous contacts. We had an interview done with the Sheriff's Department and upon the completion of that, he indicated to us that he would like to speak to Mr. Rakovich." Crivello agrees that he made the decision to order Rakovich in and was more than a passive participant in the investigation: we "had a situation of two people who were conducting interviews and discussion with a chief witness in a felony case that I was prosecuting and they were consulting me because this was something I was very interested in." Also indicative of his independent and active participation was Crivello's focus, which was somewhat different than that of the officers. The officers were concerned with the leak aspect of Rakovich's behavior, whereas Crivello was more concerned with the witness tampering aspect. Crivello determined that the facts of this case were "very close" to the requirements of Wisconsin Statutes Annotated § 943.30 (West 1980), the statute concerning influencing a witness, *see supra* note 8. He claimed he had sufficient information by virtue of the investigative reports and the statements made by Officers Wade and Drake to order Rakovich in. However, Rakovich disputes that Crivello relied on the report in calling the conference. Drake testified that at the charging conference Crivello had stated that "he had not seen our investigative report or read it before our appearance, but he had talked to us." Rakovich states

the same in his testimony. Hall testified that Crivello did read the report. Rakovich agrees that Crivello later read the report and considered all the evidence concerning the matter, and then Crivello stated that the officers' actions were not without some justification. Even assuming that Crivello did not in fact read the report until sometime after the charging conference, we nevertheless are not persuaded that this shows Crivello abdicated his authority to the officers. To the contrary, even absent the report, Crivello was armed with the same information from meetings with the officers and from a meeting with Sergeant Scopoline, an experienced investigator from outside the Greenfield Police Department.[10] Scopoline testified that after his interview of Rakovich he believed "that there was a sufficient basis to have the D.A. alerted to this particular investigation." In discussing the work of the officers, Crivello stated that the officers' investigation was in no way vindictive or capricious. He viewed their actions as within the bounds of customary police practices and good police investigative work.

Again more direct evidence connecting the charging conference to the injury is required unless mere speculation is to guide the analysis. We cannot infer in these circumstances that failing to read the report, even if true, means that the Assistant District Attorney gave up control of his case.

■ Whether the information was oral or in report form, and even if the officers somehow were "overly persuasive," the investigatory evidence was not so weak that suggesting the conference was improper and that therefore retaliation must have been the motivation. The role of the police officer differs from that of the Assistant District Attorney. Officers are concerned with investigating suspected crime, exactly what these officers did when following the suspicious witness contacts and investigating a possible internal leak of Department information. Rakovich claims the contrary, that in no way could any of his acts be viewed as criminal.[11] In fact he points

10. Crivello had utilized Scopoline on previous occasions:
    Sergeant Scopoline is a detective with the major occurrences unit of the Sheriff's Department. I frequently use that unit and specifically Sergeant Scopoline in investigations that I do. I have had many cases in the course of the last ten years where I have used Sergeant Scopoline specifically because of what I regard to be his proficiency as an interviewer. When I decided that an independent agency should also be looking at this to advise me, I selected Sergeant Scopoline, because I was familiar with his work and I had depended on him in the past.

11. Rakovich adds several tangential arguments in an effort to bolster his case. First, he claims that Crivello ordered the officers to stay clear of Sheehan after the charging conference, and they did not do this. We are unsure of the relevance of this fact, but in any event, the record clearly indicates that the Assistant District Attorney only restricted visits relating to the Rakovich matter and did not restrict contact for purposes relating to other investigations. It was an investigation of an auto parts theft that took the officers to Sheehan after the charging conference.
    Second, Rakovich claims that no information besides that planted by Wade and Drake reached Sheehan through the alleged source. Again we do not see the relevance of this fact. The officers were told there was a leak in the

Department. This gave the impetus for the further investigation and the eventual planting of the false information. Some of this false information reached Sheehan (the record also indicates that before the material was planted Rakovich told Sheehan that he was being investigated, which was true). We fail to see how this shows some retaliatory motive. Rakovich also points out that since over fifty people had access to the trays that contained the information the plant had no chance of success. The record shows that the officers had hoped to secure fingerprints, other than their own, from the planted information. Rakovich has neither stated why the efficacy of their investigative approach is relevant to the propriety of the investigation nor has he presented any evidence that somehow the allegedly poor technique was directed toward injuring him. Just the opposite seems likely: sloppy techniques would lessen any chance of tracing leaks first to a particular source and then to Rakovich. Again, we fail to see how this shows retaliatory motive.
    Third, Rakovich points out that defendant Drake testified that he thought Rakovich's behavior had not violated the statutes, an admission which evidences the groundlessness of a call for a charging conference. Placing this in its proper context, Drake's full testimony was that since Crivello reviewed the statutes and did not formally charge Rakovich, Rakovich's behavior must not have been criminal. This is no more than an after-the-fact acknowledgment by

out that Officer Hall, a member of the Greenfield Police Department acquainted with the officers, testified that he thought the suggested charges were groundless. Also, according to Hall, when he asked Wade why he pursued the investigation when it appeared that Rakovich had done nothing wrong, Wade responded that "he knew they didn't have anything, but he was told to push" by the Chief and the Mayor. Kass and the Mayor denied this. More precisely Rakovich denies that he ever told Sheehan that he had a source in the Greenfield Police Department. Instead he claims to have heard at a Common Council meeting that they were investigating and trying to discredit Sheehan. Allan, a reporter with the *Greenfield Observer*, testified that Rakovich told her that the witness Sheehan was the source of his information. Apparently Rakovich did not mention a departmental source to Allan.

In his depositional testimony, read at trial, Sheehan, the burglary witness Rakovich contacted, disagreed with Rakovich's version of the facts regarding a source:

He came down here to tell me that, uh, that he found out from somebody in the Greenfield Police Department that they were checking me out and that, uh, he was hinting around to me, like telling me that there's laws on that, that I could sue the Greenfield Police Department for finding out information that they're not supposed to be nosing into, or whatever the way he put it.

Sheehan testified further that Rakovich offered him $50.00 to use as a retainer for a lawyer, who could accompany him and a newspaper person to the Police Department to acquire any records regarding Sheehan.

Sheehan also stated that Rakovich had indicated "[t]hat he had a source in the Greenfield Police Department," a claim Rakovich had made on several occasions, and had also indicated "he had a friend in the police department, and at times he mentioned like a police officer or a friend of a police officer in the police department." It was not only Rakovich's claims of a source that Sheehan relayed to the officers, but specific bits of information that source allegedly supplied from the Department. On September 12, according to Sheehan, Rakovich

asked me if I was ever arrested in Ohio. And I got talking to him that he had information that he got through the [Greenfield] police department, that I was arrested in Ohio. He told me that— first he told me he overheard a couple officers talking that I was arrested in Ohio for car theft. And then he turned around and then he goes—well, I asked him, how true is that. He goes, "Well, I have a source in the police department." And the source told him that they found some information that I was arrested in Ohio.

Sheehan prepared notes five or ten minutes after the meeting, which he read verbatim to Drake and Wade the next day. This was when Drake and Wade first learned that Rakovich said he had a source in the Department. Their testimony is consistent with that of Sheehan, and with the documents maintained by the officers during the investigation.

Whether or not it was true that a leak existed, it was clear that Sheehan supplied information to the officers that they had a leak within the Department and that Rako-

---

Drake that the Assistant District Attorney is the ultimate expert in the final determination of criminality, and that Crivello's technical application of Wisconsin law to the activity Drake suspected was criminal resulted in no criminal charges.

Fourth, Rakovich points out that Detective Lieutenant Phillip Hall testified that Wade had taken the investigation file home and refused to return it until he was threatened with a suspension. Beyond some testimony that the file was taken home to avoid the wandering eyes of the Department leak, nothing but mere speculation ties this to any improper motive.

Fifth, Rakovich claims that the officers were attempting to coerce Sheehan into changing his statements regarding Officer Foley's role in the burglary apprehensions. He supports this claim by referring to several remarks Sheehan made to him, in which Sheehan criticized Wade and Drake. Again beyond the relevancy shortcomings of this assertion, it is undisputed that Sheehan was working undercover for the Greenfield Police Department, specifically with Wade and Drake. As Sheehan testified, he made the derogatory remarks for no other reason than to keep his cover intact.

vich was somehow involved in the leak. Aware of such information, it is not surprising that the officers began an investigation of this suspected criminal activity. Pursuant to their investigation, on September 9, the officers placed false information regarding Sheehan in their mailboxes, hoping that it would be read and that the reader's fingerprints would reveal the reader's identity. No such fingerprints were found, but the planted information seems to have reached Rakovich, who then divulged it to Sheehan on September 17. The officers investigated their suspicions, pursued their investigation to its culmination, and in so doing they collected evidence potentially showing that Rakovich had utilized a source in the Police Department. From there, Scopoline, Crivello's chosen interviewer, was brought in to interview Rakovich, an effort to have a less interested officer objectively apprise the situation. After the September 21 interview Scopoline stated that he believed there was probable cause to suspect Rakovich had committed a crime. On that same day Crivello ordered a charging conference held. The officers had no other contact with Sheehan except for a September 22 meeting, arranged after Sheehan called the officers complaining that he had received a threatening call and that Rakovich and Salbashian had slowly driven by Cars Unlimited, Sheehan's place of employment.

■ The officers did no more than what was expected of competent police officers: they investigated suspected criminal activity, and once they had collected sufficient information, the case was turned over to the Assistant District Attorney for a decision regarding the filing of criminal charges. We are not determining that Rakovich actually secured and disclosed information from a source in the Police Department, but it is undisputed that Sheehan told the officers this was the case, and they acted appropriately upon that belief. Nothing suggests, therefore, that the officers were "motivated" by an improper purpose.

### 3. Information Release

■ Rakovich also complains that the release of information regarding the confer-

ence was improper. Because we have decided that the calling of the charging conference, a customary procedure open to the public and a matter of public record, was proper, the publishing of the calling of the conference cannot be derivatively tainted. Instead, Rakovich must show that the information release and publication was itself in some way improper, and this he has not done. Crivello instructed the officers they could release the fact that Rakovich was being called in for a charging conference, but nothing more regarding the investigation. Kass testified that he had told Wade that once Crivello approved he could make the limited release. Drake testified that "the Chief is the ultimate authority in releasing the information. However, he will delegate someone to make the release. Generally the release will be made by someone that's informed about the case." Drake consulted with Kass, who testified that he told Wade he could release the fact that Rakovich was being called in for a charging conference when Crivello said he could. The officers followed those directions. Also, Allan, the *Observer* reporter, testified that while she was on her regular beat at the police station on September 21, 1981, the Chief told her that Rakovich would be ordered in for a charging conference. He said nothing more regarding Rakovich. The information release about a conference open to the public followed the customary procedure and was not improper.

### 4. Mt. Healthy *Conclusion*

■ The record before us clearly establishes that Rakovich has not carried his *Mt. Healthy* burden of persuasion showing that retaliation "motivated" the officers. For functional ease we analyzed the record within several categories, but of course, we must consider all the evidence as a whole to determine its true significance. Read together, in the light most favorable to Rakovich, no reasonable juror could find that retaliation "motivated" the decision to call the charging conference, and the giving of the limited release to the newspaper. We reach this conclusion in light of *Mt.*

*Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and this circuit's opinions in *Endicott v. Huddleston,* 644 F.2d 1208 (7th Cir.1980), *Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.1981), and *McClure v. Cywinski,* 686 F.2d 541 (7th Cir.1982). If we viewed it otherwise we would be accepting the veneer of retaliation molded out of accumulated general and stale evidence that in no way was directly tied into the alleged deprivations, which Rakovich attempts to bolster through nothing but a pattern of circular reasoning.

The only specific evidence of animosity between the officers and Rakovich, or between Kass and Rakovich, a 1977 incident, is too far removed to show that the 1981 investigation, considering all these other legitimate circumstances, was motivated by retaliation. Likewise, evidence that the officers were less than totally convinced that Rakovich's actions violated a particular statute does not make their investigation and suggestions regarding the charging conference infirm. The charging conference is the approved procedure to make that determination. The evidence shows that only speculation or exaggeration could link each category of evidence to the claimed injury. Considering the evidence as a whole does not change this outcome. No evidence directly relates these disparate examples to the decision to investigate or to suggest charges against Rakovich because of his first amendment activities. To view it otherwise we have to subscribe to some circular-reasoning enhancement of these bits of evidence. Such reasoning might be that the historical animosity continued into 1981 because a properly motivated officer would not have suggested charging Rakovich on less than the firmest commitment to his ultimate guilt. It would have to follow from that, since we have now reasoned that the historical animosity continued into 1981, that it motivated the investigation. This back and forth shoring up of isolated bits of evidence will not support the weight of Rakovich's charge. This is not the type of evidence that a jury should be asked to weigh.

Moreover, ignoring the problems of relevancy and Rakovich's failure to tie any animosity to the officers' actions, there is no evidence of any negative picture painted by the officers in suggesting the charging conference to the Assistant District Attorney. To the contrary, the course taken was customary, prudent, and fair. The evidence is clear that the officers had reason to suspect some improper activity on the part of Rakovich. When the investigation ripened to where the officers had sufficient information for it to be determined whether a crime had been committed, they referred the matter to the expert in evaluating criminality, the Assistant District Attorney. Just before this happened, Milwaukee sheriff's sergeant Scopoline, skilled in interviewing and arguably less interested, interviewed Rakovich and reported his results to Crivello. Based on this information and that provided by the officers, Crivello decided to call a charging conference, a procedure with advantages both to the prosecutor and to the potential defendant. This afforded Rakovich an opportunity to explain his actions and persuade Assistant District Attorney Crivello to exercise his discretion and decline to file formal criminal charges. Rakovich succeeded. It is true that the officers suggested several applicable statutes to Crivello that, in hindsight, may have been only tenuously related to Rakovich's activities. We do not believe, however, that these suggestions, coming from police officers and not lawyers, slanted the decision-making process of the District Attorney or changed what the evidence showed. The officers could rightfully believe that Rakovich had committed some improper act. Crivello stated as much. In any event, Crivello seems to have had his own ideas on this matter, specifically that Rakovich was interfering with a state's witness, a view that Crivello had held from the initiation of the investigation. All in all, the officers did what other officers typically do in the charging context: they made suggestions. We refuse to hold an officer to a standard that requires that he know with certainty that a statute has been violated before he

presents the case to the District Attorney. Besides chilling proper police investigatory work, that is a determination properly left to the District Attorney. Lastly, the officers did nothing improper in releasing the fact that a conference would be held with Rakovich. The charging conference, as is typical, was open to the public. The disclosure to the press was quite limited and given with the approval of the Assistant District Attorney. Rakovich failed to carry his burden of showing that retaliation "motivated" the officers. The officers' motion for judgment notwithstanding the verdict should have been granted.[12] Even if we

## C. QUALIFIED IMMUNITY—*HARLOW* AND *ANDERSON*

As we begin the immunity analysis we note, as we did in our discussion of causation, that the correct standard, here the objective standard set out in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), was neither briefed nor applied. The officers first proffered the absolute and qualified immunity argument[13] in their trial brief, which served as

were to hold otherwise, the officers are qualifiedly immune as a matter of law.

---

**12.** We point out that we have been discussing the plaintiff's burden under *Mt. Healthy* and caution that our discussion of the officers' proper motivations may more precisely fit within the defendant's burden under *Mt. Healthy,* that is, he or she would have acted in the same manner even in the absence of the plaintiff's protected behavior. For example, our detailed discussion above of the officers' suspicions that Rakovich acted improperly (the officers thought Rakovich had a source in the Department) would have led them to act, whether or not a critical and unpopular Rakovich was involved. However, much of Rakovich's case in chief discussed and refuted what may properly have been a part of the defendant's case under *Mt. Healthy.* Even if we manipulate the parties' cases to comport with the allocation directed by *Mt. Healthy* and also assume that Rakovich has carried his burden of persuasion, demonstrating that retaliation "motivated" the officers' actions, our previous discussion of the record demonstrates that the officers would have acted in the same fashion even in the absence of the constitutionally protected activities of Rakovich (again we note the officers' well-founded suspicions of criminality or impropriety). *See Perry v. Larson,* 794 F.2d 279, 283 (7th Cir.1986); *Knapp v. Whitaker,* 757 F.2d 827, 844–45 (7th Cir.), *appeal dismissed and cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985); *McClure v. Cywinski,* 686 F.2d 541, 547–48 (7th Cir.1982); *Wren v. Jones,* 635 F.2d 1277, 1286–87 (7th Cir.1980) (per curiam), *cert. denied,* 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 110 (1981). Investigation or prosecution of a criminal suspect is not foreclosed merely because a government official, such as a police officer, may personally dislike the suspect.

**13.** The officers claim the protection of an absolute immunity because, as they argue, they acted as an "agent" or arm of the Assistant District Attorney, an official who does enjoy an absolute immunity. *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) ("We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is

immune from a civil suit for damages under § 1983."). In *Malley v. Briggs,* 475 U.S. 335, 342–43, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Supreme Court rejected an attempt to draw "an analogy between an officer requesting a warrant and a prosecutor who asks a grand jury to indict a suspect."

> We have interpreted § 1983 to give absolute immunity to functions "intimately associated with the *judicial* phase of the criminal process," *Imbler, supra,* 424 U.S. at 430, 96 S.Ct. at 995 (emphasis added), not from an exaggerated esteem for those who perform these functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself. We intend no disrespect to the officer applying for a warrant by observing that his action, while a vital part of the administration of criminal justice, is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment. Furthermore, petitioner's analogy, while it has some force, does not take account of the fact that the prosecutor's act in seeking an indictment is but the first step in the process of seeking a conviction. Exposing the prosecutor to liability for the initial phase of his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work, since the prosecutor might come to see later decisions in terms of their effect on his potential liability. Thus, we shield the prosecutor seeking an indictment because any lesser immunity could impair the performance of a central actor in the judicial process.
>
> In the case of the officer applying for a warrant, it is our judgment that the judicial process will on the whole benefit from a rule of qualified rather than absolute immunity.

*Id.* (footnote and citation omitted). Likewise here we will not analogize the officers' providing of suggested statutes to the prosecutor's seeking of an indictment. These officers are not "central actors in the judicial process" and a grant of qualified, rather than absolute immuni-

the basis for their later trial court motions on that same issue. Their description of the relevant standard was that "[t]o be protected by good faith qualified immunity, the defendant must prove that he believes, in good faith, that his conduct was lawful and that such belief was reasonable." Also, in that portion of their motion for directed verdict discussing the qualified immunity argument, made at the close of Rakovich's case in chief, the officers repeated that standard and added the following:

And there has been no proof by the plaintiff that the defendant engaged in any unreasonable conduct or any unlawful conduct. There has been no witness who testified on behalf of the plaintiff even that the practice engaged by the police here, the investigation into the Mary Foley commendation and the follow-up investigation into the Rakovich claimed source and leak from the Greenfield Police Department, was in any way an improper police practice. No plaintiff's witness testified to that effect.

The trial judge summarily denied the motion, but agreed that the arguments could be raised once again at the close of the evidence. The officers subsequently did so, moving for a dismissal and a directed verdict. The trial court provisionally denied both motions, reserving final determination of the directed verdict motion.

The qualified immunity determination, however, was left to the jury with the following instruction:

Additionally they have raised the defense of qualified immunity, qualified governmental immunity, which I will define later. Thus if you find that the plaintiff has proved his claim by a preponderance of the evidence, the defendants may nonetheless successfully defeat his claim by showing one, that they reasonably believed their acts were authorized by law, and that they acted in good faith on this reasonable belief.

The defendants must prove these two elements by a preponderance of the evidence if they are to get the qualified immunity. Therefore, if you find that on the basis of all the evidence that the plaintiff has proven his claims by a preponderance of the evidence, then you should consider whether any or all of the defendants have proven this defense that I have just outlined to you by a preponderance of the evidence.

In making this determination, you should consider all the evidence in the same fashion in which you consider the evidence in deciding that the plaintiff has proven his claim. However, if you decide the plaintiff has not proven his claim by a preponderence of the evidence, then you do not have to go forward and consider the immunity defense.

In the officers' several post-verdict motions they again raised the qualified immunity argument, once more claiming that a two-prong test must be applied: 1) subjective prong, whether the officer in "good-faith" believed his actions were lawful, and 2) objective prong, whether the officers' belief was reasonable.

In denying the post-verdict motions the trial court wrote the following in its March 4, 1985 Decision and Order:

Defendants further argue that they are immune by virtue of a good-faith qualified immunity defense. The jury was instructed on this point, and it disagreed. The evidence in this regard raised a question for the jury, and there was evidence to support their verdict. It will not be set aside on this ground.

In their brief before this court the officers claim the protection of a "good faith immunity," citing *Pierson v. Ray*, where indeed the Supreme Court held that "the defense of good faith and probable cause, which [is] available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). The officers further claim that the test for determining good faith is an objective one, citing *Harlow*, 457 U.S. 800, 102 S.Ct. 2727,

---

ty, will not somehow impair later stages of the judicial process. *Id.* As in *Malley,* the officers

here enjoy the protection of a qualified immunity, and not an absolute immunity. *Id.*

73 L.Ed.2d 396; *Johnson v. Brelje*, 701 F.2d 1201 (7th Cir.1983); and *Crowder v. Lash*, 687 F.2d 996 (7th Cir.1982).

According to the officers, Kass acted in "good faith" when he ordered an investigation of the burglary apprehensions and arrests since he had received a complaint against the Department (criticism of the commendation), which mandated that an investigation be conducted, a requirement of Greenfield Resolution No. 1588. This Resolution requires that any complaints against the fire or police departments be routed to the Chief of the concerned department, who must begin an investigation of the complaint. Also, claim the officers, Kass acted in "good faith" when he ordered an investigation into the departmental leak, since he believed such a leak "strikes at the integrity of the department" and "[Greenfield Police Department] General Order No. 20 requires members of the department to keep the business and functioning of the department confidential." Likewise Wade and Drake claim that since they "were following Crivello's orders and advice, ... [they] did not violate Rakovich's clearly established constitutional rights of which a reasonable person would have known." The officers conclude by stating that they should be protected from liability "by good faith qualified immunity" because they "acted with good faith and pursuant to accepted police procedures throughout the investigation." The officers refer the court to various portions of Assistant District Attorney Crivello's favorable testimony to support this proposition.[14] The officers claim that Lieutenant Hall provided the only testimony critical of the investigation, and he did no more than point out that Wade and Hall asked leading questions and that so many people had access to the planted information that the investigation could not conceivably ferret out the leak.

Thus, the officers claim as error the trial court's refusal to grant those portions of the motion for directed verdict, as well as those portions of the motion for judgment notwithstanding the verdict that assert the immunity defense. The officers did not object to the jury instructions regarding immunity.

In his brief before this court, Rakovich agreed that "defendants must prove, that (1) they had a 'good faith' belief that their actions were proper and lawful, and (2) this belief was reasonable. The first test is subjective, the second objective." According to Rakovich, since the officers' conduct was "in bad faith for the sole purpose of retaliating against [Rakovich] for his discussions" the immunity fails. This is evidenced, he claims, by the testimony of Hall and Krukowski, testimony that indicates that Wade knew Rakovich's behavior did not violate the criminal statutes but that Kass insisted the investigation continue and that the information should go to the Assistant District Attorney.

Both parties argued an erroneous test of immunity, the district court applied this erroneous test, and the jury was permitted to make the legal determination of the applicability of the immunity to the officers, properly a question of law for the court.

### 1. Scope of Immunity/Standard of Review

#### a. Legal Question

The jury's role does not extend to the determination of immunity because the is-

---

**14.** In their appellate brief the officers excerpted portions of Crivello's testimony.

Crivello testified that:
1. the defendants operated in a professional, thorough and courteous manner; (Tr. 878, 883),
2. he approved of the techniques used by the defendants; (Tr. 852),
3. the defendants did not overstep their bounds during the course of the investigation; (Tr. 852),
4. the defendants committed themselves to an investigation that was sufficient enough in its integrity to have Rakovich appear before the district attorney for a conference; (Tr. 865),
5. the investigation was not petty or vindictive and that the defendants were not out to get Rakovich; (Tr. 877, 878, 883),
6. the statutes suggested by the defendants were the type of statutes that other officers would have suggested; and, (Tr. 864),
7. the fact that he did not issue charges has no relevancy to whether or not the defendants should have brought the matter to his attention. (Tr. 864).

Appellants' Brief at 39–40.

sue of qualified immunity is a legal question for the trial court, not the jury. *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); *see Harlow,* 457 U.S. at 817–19, 102 S.Ct. at 2737–38; *Benson v. Allphin,* 786 F.2d 268, 274 (7th Cir.), *cert. denied,* 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986) (two petitions for certiorari denied, Nos. 86–27 and 86–29); *Llaguno v. Mingey,* 763 F.2d 1560, 1569 (7th Cir.1985) (en banc);[15] *Bates v. Jean,* 745 F.2d 1146, 1151 (7th Cir.1984); *Joseph v. Brierton,* 739 F.2d 1244, 1248–49 (7th Cir.1984); *but see Llaguno,* 763 F.2d at 1576–77 (Coffey, J., concurring in part and dissenting in part). Although the qualified immunity determination is a legal question it is not answered in the abstract but in reference to the particular facts of the case. *Green v. Carlson,* 826 F.2d 647, 649 (7th Cir.1987). Here not only did the jury determine the legal question of qualified immunity, but it did so under an erroneous standard. The officers, however, did not challenge the jury's role or the instruction, in either the district or appellate courts.

This court was presented with a similar circumstance in *McKinley v. Trattles,* 732 F.2d 1320 (7th Cir.1984). In *Trattles* the jury received an immunity instruction that required it to determine the subjective "good faith" of the defendants, an instruction that the defendants themselves had proposed. The defendants did not object to the instruction. In that decision this court acknowledged the non-role of the jury in the immunity determination, as well as the error in using a "subjective" immunity standard. Nevertheless the court refused to remand for application of the correct standard, finding that by not objecting to the instruction the defendants had failed to preserve the issue for appeal. *Id.* at 1324–25. As a result, the erroneous standard became the "law of the case." *Id.* Thus the *Trattles'* court went on to review the jury's determination of the officer's "good-faith," agreeing with the district court that by holding the defendants liable for punitive damages the jury necessarily found that the defendants acted with reckless disregard, which "necessarily entailed a rejection of [the defendant's] 'good faith' testimony. Thus, the denial of the JNOV on good faith, even under the erroneous legal standard applied, was justified." *Id.* at 1325.

The *Trattles* decision tracks the requirements of the Federal Rules of Civil Procedure: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds for the objection." Fed.R.Civ. P. 51 (1987) (amended Aug. 1, 1987). *E.g., Ramsey v. American Air Filter Co.,* 772 F.2d 1303, 1312 (7th Cir.1985). Although some courts may recognize a plain error exception to the objection requirement, *see* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2558, at 674–75 (1971), in this circuit "[n]o doctrine of 'plain error' protects parties from the consequences of their decisions in civil litigation." *Williamson v. Handy Button Mach. Co.,* 817 F.2d 1290, 1295 (7th Cir.1987). *See Parrett v. City of Connersville,* 737 F.2d 690, 698 (7th Cir.1984), *cert. dismissed,* 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985); *Schroeder v. C.F. Braun & Co.,* 502 F.2d 235, 243 (7th Cir.1974). There may be an

---

**15.** In *Llaguno* "[t]he judge gave an instruction on immunity: 'The law allows a defendant to defend a charge of unconstitutional entry by claiming a good faith belief that, under the circumstances, it was reasonable to enter the Llaguno house without a warrant. The defendant also must prove that such good faith belief was reasonable.'" 763 F.2d at 1569. A divided court held that the issue of qualified immunity is not a jury question except in the exceptional circumstances outlined in *Harlow. Id.* Leaving the legal determination to the jury with the use of instructions such as those given here may "confuse the jury and give the defendants two bites at the apple." *Id.*

In the unusual circumstance where an immunity inquiry remains unresolved at the time the case goes to the jury, the district court may consider the use of special interrogatories to allow the jury to resolve disputed facts, which the court can then use as a basis for an immunity analysis as a matter of law. *See* Fed.R.Civ.P. 12; *Dual Mfg. & Eng'g v. Burris Indus.,* 619 F.2d 660, 667 (7th Cir.) (en banc), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980).

exception to the objection requirements of Rule 51, in "very rare circumstances where necessary to prevent a miscarriage of justice." *Shearson Hayden Stone, Inc. v. Leach,* 583 F.2d 367, 370 (7th Cir.1978) (citing, *inter alia,* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2558, at 672 (1971)). However, where, in addition to failing to object, the defendant proposes the very instruction given (the situation here), he or she cannot later complain of error. *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 675 (7th Cir.1985), *cert. denied,* 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986). As a result, instructions not properly objected to become what is often called the "law of the case." *Williamson,* 817 F.2d at 1296. *See Trattles,* 732 F.2d at 1324–25. This status as law of the case is very limited:

> It is true, of course, that an appellant may not challenge on review the correctness of instructions to which he took no exceptions or only a general exception. Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A.; *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 [citations omitted]. In that sense, and in that sense only, it may be said that the instructions to which no exceptions are taken become the law of the case for determining whether the *instructions* are subject to review on appeal. [Citations omitted.] But in determining whether a trial court has erred in denying a *motion for directed verdict* made at the close of the evidence, it is the applicable law which is controlling, and not what the trial court announces the law to be in his instructions. This Court must ascertain for itself what the applicable law is, whether the instructions were excepted to or not. A proper motion for directed verdict and its denial will always preserve for review the question whether under the law truly applicable to the case there was an adequate evidentiary basis for the submission of the case to the jury.

*Coca Cola Bottling Co. of Black Hills v. Hubbard,* 203 F.2d 859, 862 (8th Cir.1953) (quoted with approval in *Dual Mfg. & Eng'g Inc. v. Burris Indus.,* 619 F.2d 660,

663 (7th Cir.) (en banc) (emphasis added), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980)).

■ Here, as in *Trattles,* any error regarding the jury instructions was not properly preserved for appellate review. Not only did the officers fail to properly object in the district court, they have not raised the issue in this court. We have, nevertheless, reviewed the instructions because of several errors readily apparent from our review of the record. However, merely because we consider the issue we do not mean that some miscarriage of justice rationale justifies our intervention, beyond guidance, on the jury instructions issue. This is not the extraordinary case that cries out for such action, and it is dubious that such a "plain error" rationale may be invoked in this circuit. Moreover, the Federal Rules and Seventh Circuit case law establish that we may not ordinarily reverse on the basis of instructions not objected to at trial; if we deal with the instructions we must uphold the instructions as the law of the case. However, even though the officers properly challenged the jury's findings on the liability and immunity issues in their motion for judgment notwithstanding the verdict, we decline the opportunity to review the *jury's* decision of the immunity issue under the *overruled* immunity standard.

In part we decline because no special separate factual findings on the immunity issue accompany the jury's verdict. Even though it is true that the jury's verdict against the officers, though misguided, necessarily means that the jury determined the officers were not immune, we cannot discern their reasoning or its factual basis. That verdict is inadequate to control application of the no reasonable juror standard previously mentioned. The immunity issue had been raised in the officers' motion for directed verdict at the close of Rakovich's case in chief, and in that context the correct law must be applied whether properly raised by the parties or not. Because we decide that the officers should have been found immune at that stage of the proceedings, the issue of the merits of the jury's

actions under the outdated standard is immaterial.

b. Immunity in Directed Verdict Context

■ Qualified immunity is an affirmative defense that must be pleaded by the defendant. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Kompare v. Stein*, 801 F.2d 883, 886 (7th Cir.1986). Here, the officers pleaded the defense but did not do so until they moved for a directed verdict at the close of Rakovich's case in chief although the immunity issue had been raised in their pre-trial brief. Although the purpose of an objective qualified immunity inquiry is to avoid unnecessary burdens on government officials by more frequent use of the summary judgment tool, this does not inhibit the officers' ability to raise the immunity defense at a latter stage of the proceedings. Further, we acknowledge that the officers presented the district court with the incorrect case law on the qualified immunity issue, but Rakovich has not made any argument on this point. However, this is not a jury instruction issue where the failure to object or a defendant's provision of the incorrect legal standard becomes the law of the case. To the contrary, this is a legal question reviewed *de novo* by the appellate court, requiring our application of the correct legal theory. Not bound by the officers' incorrect citation of the law, we instead determine whether the issue now raised on appeal was properly raised in the motion for directed verdict submitted to the district court. What is required of a directed verdict motion is set out in the Federal Rules: "A motion for directed verdict shall state the specific grounds therefor." Fed. R.Civ.P. 50(a). "The rule does not require technical precision in stating the grounds of the motion. It does require that they be stated with sufficient certainty to apprise the court of the movant's position with respect to the motion." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2533, at 580 (1971) (footnotes omitted).

In the district court the officers argued for the protection of qualified immunity, and they presented facts in support of their argument. The parameters of the argument were clearly set: does a police officer in this situation enjoy a qualified immunity? The question required a legal determination by the district court, which required the application of the current law on immunity. The district court's apparent application of the officers' outdated standard does not preclude our review; thus, the qualified immunity issue was raised and properly preserved for this appeal.[16]

■ As for the standard of review, it does not change merely because the issue is immunity. In *Green v. Carlson*, this court made explicit what it had already implicitly recognized: "when considering a qualified immunity claim on summary judgment, [the district court should] examine all the undisputed evidence in the record." 826 F.2d 647, 651 (7th Cir.1987). This "will often require examination of the information possessed by the [defendants]." *Anderson v. Creighton*, — U.S. —, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). "Because qualified immunity turns on the defendant's actual conduct, the district court should examine all the evidence available to it in determining what the conduct was." *Green*, 826 F.2d at 651. In *Green* this court reasoned that since the Supreme Court had given no indication that the immunity issue should be treated differently than any other issue raised in the summary judgment context the usual summary judgment procedure (consider all the undisputed facts in the light most favorable to the non-movant) should be followed. *Id.* Likewise, the Supreme Court has not indicated that the immunity issue in the directed verdict or judgment notwithstanding the verdict contexts should follow a procedure different from that applied to other issues in these contexts. Thus, when the issue of qualified immunity arises in the directed verdict or judgment notwithstanding the

---

**16.** There is no waiver of the qualified immunity defense in the circumstances of this case, in contrast to the situation in *Walsh v. Mellas*, 837 F.2d 789 (7th Cir.1988). In *Walsh* the defense was not brought to the attention of the trial court and not raised until the second appeal. *Id.* at 799–800.

verdict contexts, the district court should consider all the undisputed evidence in the record in the light most favorable to the non-movant. So must we.

### 2. Harlow *And Its Progeny*

There have been relatively recent developments of the immunity law relevant to a state law enforcement officer, beginning with *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), decided some fifteen years before *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and ending with *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In *Pierson* the Supreme Court held "that the defense of good faith and probable cause, ... available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983." 386 U.S. at 557, 87 S.Ct. at 1219 (section 1983 suit against state police officers). "Good faith" became the operative term in the analysis. With the *Wood v. Strickland* decision the Court further defined the applicable test. 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (section 1983 suit against school administrators, school board members, and the school district). Under *Wood,* in the "specific context of school discipline, ... a school board member is not immune from liability for damages under § 1983 if [1)] *he knew or reasonably should have known* that the action he took within his sphere of official responsibility would *violate the constitutional rights* of the student affected[; or, 2)] he took the action with the *malicious intention* to cause a *deprivation of constitutional rights or other injury* to the student." *Id.* at 322, 95 S.Ct. at 1001 (emphasis added). Element one required an objective determination, whereas element two required a

subjective determination. "The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.' *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). The subjective component refers to 'permissible intentions.' *Ibid."* *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2737. Apparently that was the test both the officers and Rakovich sought to apply in the trial court: an objective-subjective hybrid. That was the wrong test because, with its 1982 *Harlow* decision, the Supreme Court abolished the subjective element of the test. The officers only briefly mentioned *Harlow* in their brief to this court.

Retaining only the objective element, the *Harlow* Court held "that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738 (citing *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood,* 420 U.S. at 322, 95 S.Ct. at 1001). Importantly, *Harlow* dealt with the issue of qualified immunity in the summary judgment context, and in large part, this explains the importance of an objective immunity analysis. An objective analysis is less fact bound than a subjective analysis, making summary judgment a practical and effective means of terminating unnecessary litigation. The necessity of protecting government officials from the costs of trial and burdens of discovery, whenever possible, supports the increased use of summary judgment.[17]

*Harlow* was not limited to the summary judgment context, although the benefits of

---

**17.** Subjective good-faith is incompatible with the summary judgment tool as many courts have determined that evaluation of such a fact-bound element must be undertaken by the jury. *Harlow,* 457 U.S. at 816 & n. 27, 102 S.Ct. at 2737 & n. 27 (citing, for example, *Landrum v. Moats,* 576 F.2d 1320, 1329 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978)). *See, e.g., Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) ("At common law, in cases where probable

cause to arrest was lacking, a complaining witness' immunity turned on the issue of malice, which was a jury question." (citing 4 W. Wait, Actions and Defense 345 (1878)). "Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government." *Harlow,* 457 U.S. at 817, 102 S.Ct. at 2737–38 (footnotes omitted).

immunity do lessen as the suit progresses to trial. *Cf. Malley v. Briggs,* 475 U.S. 335, 338–39, 106 S.Ct. 1092, 1094–95, 89 L.Ed.2d 271 (1986) (immunity application was during a jury trial, raised by directed verdict at the close of plaintiff's evidence); *Benson v. Allphin,* 786 F.2d 268, 275 (7th Cir.) (motion for judgment notwithstanding the verdict), *cert. denied,* 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986) (two petitions for certiorari denied, Nos. 86–27 and 86–29);[18] *Crowder v. Lash,* 687 F.2d 996, 1002–04 (7th Cir.1982) (immunity determination made in motion for directed verdict). *But cf. Anderson,* 107 S.Ct. 3047 n. 8 (Stevens, J., dissenting) ("Our opinion [in *Malley*] carefully avoided any comment on warrantless searches or the proper application of *Harlow* in cases in which the claim of 'qualified immunity' could not be evaluated in advance of discovery.");[19] *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) ("The entitlement [to a qualified immunity] is an *immunity from suit* rather than a mere defense to liability; and like an absolute

immunity, it is effectively lost if a case is erroneously permitted to go to trial." (emphasis in ordingal)).

Furthermore, even though in *Harlow,* a suit brought directly under the Constitution, the Supreme Court determined the appropriate test and standard of immunity for *presidential assistants,* at the time of the trial in this case, early 1985, the *Harlow* objective formulation of the qualified immunity test applied to other public officials covered by a qualified immunity. *See Anderson,* 107 S.Ct. at 3042 ("*Harlow* clearly expressed the understanding that the general principle of qualified immunity it established would be applied 'across the board.'"); *Malley,* 457 U.S. at 340, 106 S.Ct. at 1096 ("Our cases also make plain that '[f]or executive officers in general, ... qualified immunity represents the norm.' *Harlow,* [457 U.S.] at 807, 102 S.Ct. at 2732." (bracket in original)): *Llaguno v. Mingey,* 763 F.2d 1560, 1562 (7th Cir.1985) (en banc) (this court applied the *Harlow* standard to state law enforcement offi-

---

**18.** The *Benson* court cited *Bates v. Jean,* 745 F.2d 1146, 1151–52 (7th Cir.1984), for the proposition that the immunity question could be raised "even after trial." Reliance on *Bates* may be misplaced. Even though the *Bates* court did not overturn the jury's immunity determination on grounds that it was properly a question of law for the court, the court did find that the immunity question was not for the jury. It did not rule on this issue because of the defendants' failure to object and thereby properly preserve the issue for appeal.

**19.** Justice Stevens questions the application of the *Harlow* objective standard beyond the summary judgment context and the use of such a standard to the exclusion of alternative and previously accepted defenses:

*Harlow's* removal of one arrow from the plaintiff's arsenal at the summary judgment stage did not also preclude the official from advancing a good-faith reasonableness claim at trial if the *character of his conduct* as established by the evidence warranted this strategy. The rule of the *Harlow* case, in contrast, focuses on *the character of the plaintiff's legal claim....* Consistently with this overriding concern to avoid "the litigation of the subjective good faith of government officials," [citation omitted] *Harlow* does not allow discovery until the issue of whether the official's alleged conduct violated a clearly established constitutional right has been determined on a motion for summary judgment.

*Anderson,* 107 S.Ct. at 3045 (Stevens, J., dissenting).

Justice Stevens argues that in those proceedings subsequent to the summary judgment stage officers should still be able to invoke earlier affirmative defenses they had enjoyed, such as a reasonable good faith defense. "The Court's failure to recognize that federal agents may retain a partial shield from damages liability, although not necessarily from pretrial and trial proceedings, leads it to the erroneous conclusion that petitioner must have *Harlow* immunity or else none at all save the Fourth Amendment itself." *Anderson,* 107 S.Ct. at 3047 (Stevens, J., dissenting).

However, we need not in this particular factual situation address the existence of a good-faith reasonableness claim as described by Justice Stevens. We note that *Anderson* concerned the reasonableness of a search under the fourth amendment, a unique specie of constitutional inquiry. More importantly, the officers here have raised no such claim to a good faith reasonableness defense. Although the immunity argument of the officers is laced with "good faith" language and arguments, they at all times, in both the trial court and on appeal, pressed the issue as an *immunity* defense, and nothing more (for example, the erroneous "good faith" instructions to the jury stated that the jury was to determine if the officers were "qualifiedly immune").

cers); *Coleman v. Frantz*, 754 F.2d 719, 726–27 (7th Cir.1985) (county sheriff) (collects cases); *Silverman v. Ballantine*, 694 F.2d 1091, 1092 (7th Cir.1982) (state law enforcement officers (county sheriffs and city police officers)); *Crowder*, 687 F.2d at 1001 (commissioner of corrections, warden, assistant warden, and director of classifications). *But see Anderson*, 107 S.Ct. at 3046 (Stevens, J., dissenting) ("Today this Court nevertheless makes the fundamental error of simply assuming that *Harlow* immunity is just as appropriate for federal law enforcement officers such as petitioner as it is for high government officials." (footnotes omitted)). It is also immaterial whether state or federal officers are involved: the immunity applies similarly to suits brought against either. *Harlow*, 457 U.S. at 818 n. 30, 102 S.Ct. at 2738 n. 30 ("[I]t would be 'untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.' *Butz v. Economou*, 438 U.S. [478,] 504 [[98 S.Ct. 2894, 2909, 57 L.Ed.2d 895] (1978).]").

■ Clearly, the 1984–1985 trial occurred at a time when the objective test of qualified immunity, applicable to various executive officers, including law enforcement personnel, was firmly established by the 1982 *Harlow* decision. *Harlow* articulated the test:

If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sus-

tained. But again, the defense would turn primarily on objective factors.

*Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738. The trial court denied defendants Harlow and Fitzgerald's summary judgment motion, in which they argued that as presidential aides they were absolutely immune from suit. The Supreme Court found such officials entitled to a qualified immunity and remanded the case to the trial court to reconsider whether plaintiff's pretrial showings were sufficient to survive the motion for summary judgment under the proper standard. *Id.* at 819–20, 102 S.Ct. at 2738–39.

The Supreme Court embellished the *Harlow* test in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Plaintiffs Briggs brought suit under section 1983 against officer Malley, claiming that Malley had caused the plaintiffs to be unconstitutionally arrested by presenting to a magistrate an affidavit and application for an arrest warrant that lacked probable cause. *Id.* The district court granted Malley's motion for directed verdict, brought at the close of the Briggs' evidence, in part finding Malley immune under the *Harlow* standard. The objective inquiry in *Malley* was "whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 345, 106 S.Ct. at 1098. In discussing qualified immunity the Court also stated that it provides "ample protection to all but the plainly incompetent or those who knowingly violate the law.... [I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341, 106 S.Ct. at 1096. Having set out the proper query the Court remanded the case for the trial court's determination of the reasonableness of officer Malley's actions. *Id.* at 346, 106 S.Ct. at 1099. Justice Powell disagreed with the majority's decision to remand. Instead Justice Powell reviewed the evidence, particularly the logs of the duly authorized wiretap, and reasoned that officers of reasonable competence could disagree on this issue; therefore, the Supreme Court could determine, without fur-

ther proceedings, that Malley should enjoy immunity in this suit. *Id.* at 349–50, 106 S.Ct. at 1100–01 (Powell, J., dissenting). This is what we do in the present case as the facts have been fully developed and are therefore sufficient to decide the immunity question.

The disagreement between officers referred to by Justice Powell and the majority in the *Malley* case is a situation where reasonable officers could differ on their interpretation of the law applicable at the time of the alleged violation. The clearest explanation and definition of this applicable law or the "clearly established constitutional right" is contained in the Court's recent decision in *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).[20] In *Anderson* the Court set out the specificity required in defining the right in the immunity context.

It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the previous action has been held unlawful, but it is to say that in the light of the preexisting law the unlawfulness must be apparent.

*Anderson,* 107 S.Ct. at 3039 (citations omitted).

In *Anderson* the Creightons brought a *Bivens* action against agent Anderson, seeking damages for a search violative of the fourth amendment. The trial court granted Anderson's motion for summary judgment, finding that the search was lawful. The appellate court reversed, deciding both that it was too early in the proceedings to find the search lawful and that the officers were not qualifiedly immune. The Supreme Court found too general the appellate court's finding that it had been clearly established that the fourth amendment prohibited warrantless searches of a home absent probable cause and exigent circumstances. Instead the proper inquiry, the Court held, was whether "it was *not* clearly established that the circumstances with which Anderson was confronted did not constitute probable cause and exigent circumstances." *Anderson,* 107 S.Ct. at 3039 (emphasis in original). *See Mitchell,* 472 U.S. at 535 n. 12, 105 S.Ct. at 2820 n. 12 ("We do not intend to suggest that an official is always immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances. But in cases where there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law."). The Court remanded for further proceedings.[21]

---

**20.** *Anderson* was decided several years after the trial in this case. The general rule is that judicial decisions are applied retroactively. *Solem v. Stumes,* 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984). The 1987 *Anderson* decision established no new principal of law (it merely more fully explained the requirement of qualified immunity under *Harlow*) nor would its application to the 1985 trial work any sort of inequity; therefore, there is no reason to veer from the general rule here. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971).

**21.** According to the *Anderson* Court, when addressing the qualified immunity issue upon remand in the context of a motion for summary judgment the district court should consider the following:

One of the purposes of the *Harlow* qualified immunity standard is to protect public officials from the "broad-ranging discovery" that can be "peculiarly disruptive of effective government." ... Thus, on remand, it should first be determined whether the action [the plaintiff] allege[s the defendants] to have taken are actions that a reasonable officer could have believed lawful. If they are, then [the defendants are] entitled to dismissal prior to discovery. If they are not, and if the actions [the defendants] claim [they] took are different from those [the plaintiff] allege[s] (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before [the defendants'] motion for summary judgment on qualified immunity grounds can be resolved. Of course, any such discovery should be tailored specifically to the

This circuit has also defined the necessary specificity. In *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.1987), this court found insufficiently specific the clearly established 1974 right not to be deprived of life, liberty, or property without due process of law. Instead, this court characterized the proper inquiry as whether or not "it was clear in 1974 that to fire [the plaintiffs] without notice and an opportunity to be heard, to the accompaniment of false and public statements that they were guilty of misconduct and wrongdoing and of misusing their office to help an employee of one of the entities that they regulated and of being undesirable and bad apples, violated their constitutional rights." *Id.* at 308–09.

▮ These examples indicate "that the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi*, 812 F.2d at 308. *See Green v. Carlson*, 826 F.2d 647, 649 (7th Cir.1987) ("[T]he court simply framed the question before it as 'whether the constitutional right at issue—that the defendants were deliberately indifferent to the decedent's medical needs—was clearly established as of August 1975.' [Citation omitted.] The district court therefore erred in not considering the specific facts of this case."). "Before a right is 'clearly established' it must be 'sufficiently particularized to put potential defendants on notice that their conduct is unlawful.'" *Colaizzi*, 812 F.2d at 310 (Bauer, C.J., dissenting) (quoting *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986)). Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law. *See Zook v. Brown*, 748 F.2d 1161 (7th Cir.1984) (the test "focuses on the state of the law at the time of the alleged violation").

▮ It is the plaintiff who bears the burden of establishing the existence of the allegedly clearly established constitutional right. *Abel v. Miller*, 824 F.2d 1522, 1534 (7th Cir.1987) (citing *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020, 82 L.Ed. 2d 139 (1984)). The factual circumstances of the alleged violation need not be "identical" to prior holdings in order to find an officer entitled to qualified immunity. *LeClair v. Hart*, 800 F.2d 692, 696 (7th Cir. 1986) (citing *People of Three Mile Island v. Nuclear Regulatory Commissioners*, 747 F.2d 139, 148 (3d Cir.1984) (no qualified immunity if the defendant violated "a clearly established and well litigated general proposition in which the case at hand merely presents a new factual wrinkle")). Nonetheless, "[c]losely analogous cases, those decided before the defendants acted or failed to act, are required to find that a constitutional right is clearly established." *Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir.1987) (divided panel) (citing *Lojuk v. Johnson*, 770 F.2d 619, 628 (7th Cir.1985) ("While cases involving the exact fact pattern at bar are unnecessary, case law in a closely analogous area is crucial to permit us to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly."), *cert. denied*, 474 U.S. 1067, 106 S.Ct. 822, 1588 L.Ed.2d 795 (1986)), *cert. denied*, — U.S. ——, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1987). However, this does not mean that only binding precedent will clearly establish a right.

Therefore, "[i]n the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established under *Harlow*." *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir.1985). A review of these cases should focus only on rights clearly established in their respective contexts, *Crowder v. Lash*, 687 F.2d 996, 1007 (7th Cir.1982), and this court must not expect reasonable government officials "to recognize the signifi-

question of [the defendants'] qualified immunity.

*Anderson*, 107 S.Ct. at 3042–43 n. 6 (citation omitted).

cance of a few scattered cases from disparate areas of the law for a right that is just evolving." *Lojuk,* 770 F.2d at 628. *Powers,* 820 F.2d at 821.

"This means that ... public officials are entitled to immunity unless it has been authoritatively decided that certain conduct is forbidden." *Alliance to End Repression v. City of Chicago,* 820 F.2d 873, 875 (7th Cir.1987).

### 3. Applying the Harlow Reasoning

We first determine the facts in order to formulate a specific definition of the officers' activities. We will then compare this to the law applicable in 1981 to determine if it was clearly established that the officers' activities violated the Constitution.

It is true that the officers' state of mind bears greatly on this cause of action and that under *Harlow* an objective immunity analysis at the summary judgment stage prior to discovery does not include an *evaluation* of intent. This is because evaluating intent would be a factual analysis, whereas the objective inquiry is a legal question. However, this circuit noted that the Supreme Court had "not explained how th[e] objective standard is to be employed when the plaintiff's claim depends on the state of mind of the defendant officials." *Benson,* 786 F.2d at 276 n. 19. This is such a case; intent to retaliate is an element of the cause of action.

It is a mistake to read *Harlow* too broadly. The elimination of intent from the formula does not mean that the *Harlow* Court sought to limit civil rights actions to those where state of mind was *not* a part of the substantive law. *See* Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in*

*Civil Rights Litigation,* 95 Yale L.J. 126 (1985). *Harlow* merely states that intent must not be *evaluated or weighed* through a factual inquiry, which would reduce the likelihood that qualified immunity could be decided in a motion for summary judgment. *See Harlow,* 457 U.S. 818, 102 S.Ct. at 2738. This circuit has set out an approach that gives order to this area of the law: "under *Harlow* the district court must conduct a two-part analysis: (1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question? ... Intent is relevant to (1) but not to (2)." *Wade v. Hegner,* 804 F.2d 67, 70 (7th Cir.1986). Thus, under part (1) of this approach "plaintiffs' *supported* allegations are assumed true, including intent." *Id.* at 69 & n. 3 (emphasis added). This is not unlike the approach to any summary judgment motion made before discovery, except that when considering qualified immunity where intent is a factor an assertion of improper motivation must in addition be accompanied by some specific factual support. *Hobson v. Wilson,* 737 F.2d 1, 30–31 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).[22] "*Harlow* requires that merely conclusory allegations of unconstitutional motive, devoid of factual support, must be found lacking and be dismissed." *Id.* at 31. Of course *Harlow* was in the summary judgment context whereas here the immunity defense was raised in the motion for directed verdict. Our review of the case law, however, does not indicate whether, in this context, more than the "some factual support" requirement at summary judgment must support the allegations of improper motivation.[23] We will assume, *ar-*

22. "Plaintiffs who fail to allege any specific facts to support a claim of unconstitutional motive cannot expect to involve government actors in protracted discovery and trial." *Hobson,* 737 F.2d at 30. Otherwise, a plaintiff could always avoid defendant's immunity defense by the mere assertion that improper purpose motivated the defendants.

23. We point out that it might be argued that since an immunity defense does not alter the usual approach to motions for summary judg-

ment or motions for directed verdict, under part (1) of the *Wade* analysis, which is a prerequisite to applying *Harlow* and requires a determination of whether a constitutional violation occurred, the scope of evidence properly considered in the traditional directed verdict context is applicable. Accordingly, if a reasonable juror could not find a constitutional violation, then the case should be dismissed on *qualified immunity* grounds. Obviously, this appears to be no more than an attempt to label as an immunity decision a decision on the substantive

*guendo,* that at the directed verdict stage Rakovich has presented evidence sufficient to support his claim of retaliation. Therefore, we may move to part (2) of the approach and conduct the qualified immunity analysis.

After its review of the facts known to the officers, the district court defined the immunity question as whether it was violative of the first amendment to retaliate against a person simply because the person complained that individual police officers or the police department did not properly conduct their duties. The district court found the right undisputed. As a very broad statement of first amendment law that is correct. In a 1978 decision, *Buise v. Hudkins,* 584 F.2d 223, 229 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979), this court restated the well-established rule that "an act in retaliation for the exercise of a constitutionally protected right[, for example, a first amendment interest,] is actionable under Section 1983." *Accord Matzker v. Herr,* 748 F.2d 1142, 1150–51 (7th Cir.1984). Generally criticism is such a protected first amendment right: "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California,* 314 U.S. 252, 272, 62 S.Ct. 190, 198, 86 L.Ed. 192 (1941) (comments in newspaper regarding pending litigation). "Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues shall be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) (newspaper advertisement criticizing local officials). There are some limits on free speech, such as speech considered "fighting words," *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), or speech presenting a "clear and present danger," *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per

curiam). Whether Rakovich's speech or actions truly are within the Constitution's first amendment embrace poses a different question, which we need not evaluate as the officers have assumed it is, and so will we.

In any event, the correctness of the district court's general pronouncement is of little moment, as we are concerned with a question of qualified immunity, which necessitates a much more specific characterization. The district court's decision is akin to a decision that "the right to due process of law is quite clearly established by the Due Process Clause," the paradigm example of an improper level of generality. *Anderson,* 107 S.Ct. at 3038–39. Instead we must ask was it clearly established that *under the facts of this case* it was improper to suggest a charging conference to the Assistant District Attorney and to inform a newspaper reporter of a pending charging conference? It is the filling in of facts from the particular case that shapes the query to comport with *Anderson. See, e.g., Green v. Carlson,* 826 F.2d 647, 649 (7th Cir.1987). We have already fully set forth those controlling facts.

We caution that just as the right allegedly violated should not be characterized or defined so generally that invariably guiding law is found to show the right was clearly established, the right should not be defined so intricately that invariably guiding law never can be found. A practical appraisal shows that the process of defining the factual situations from disparate types of cases results in some flexibility within the limits of the objective inquiry and within the limits of *Anderson* and its progeny. Courts are able to carefully consider the proper characterization. It need only be kept in mind that the characterization used must be sufficiently particularized to enable the district court to determine whether the officers were *on notice* that their actions violated clearly established law.

law or on the merits of the claim. This may be so, but such a result would not be surprising

when the immunity defense is raised at this stage of the proceedings.

Considering the facts of this case, the unlawfulness of the officers' actions was not "apparent," *Anderson*, 107 S.Ct. at 3039. We have been unable to find cases "closely analogous" to these facts, *Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988). Decisions regarding circumstances merely similar to the instant case are rare. Many of the cases concerning retaliation for first amendment activities are in the public workplace, a public employee is fired or denied benefits or promotion because of his or her first amendment activities. *See Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (district attorney's office terminated assistant district attorney for distributing questionnaire); *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (school board dismissed teacher for publication in newspaper of letter critical of board); *Benson v. Allphin* (*Benson II*), 786 F.2d 268 (7th Cir.) (department dismissed employee for disclosure to press of department improprieties), *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986) (two petitions for certiorari denied, Nos. 86–27 and 86–29). These public employee cases utilize a balancing test: "the problem was to arrive at a balance between the interest of the plaintiff, as a citizen, in commenting on matters of public concern and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Benson II*, 786 F.2d at 276 (citing *Pickering*, 391 U.S. 563, 88 S.Ct. 1731).

Another group of tangentially related cases concerns surveillance of political groups and organizations at the national or local levels. *See, e.g., Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (mere surveillance of public activity by nonintrusive means and cataloging of this information may be insufficient to state a cause of action); *Angola v. Civiletti*, 666 F.2d 1 (2d Cir.1981) (harassing and coercing protesting plaintiff into cooperating with Federal Bureau of Investigation states a cause of action). And a third group of cases concerns the arrest or penalizing of persons *solely* for their first amendment activities. *See, e.g., Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (per curiam) (arrested for participating in antiwar demonstration).

The cases from these clearly distinguishable groups most closely analogous to the case at bar may be several of the public employment cases. Parts of two such cases, *Benson v. Scott* (*Benson I*), 734 F.2d 1181 (7th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 435, 83 L.Ed.2d 361 (1984), and *Benson II*, 786 F.2d 268, which arose out of the same incidents, dealt with the defendants' denial of a benefit, legal representation, to the plaintiff Benson, after Benson's termination. He had disclosed to the press information critical of the defendants and of law enforcement agencies. In *Benson I*, this court distinguished this retaliatory denial of a benefit to a non-employee from the denial of benefits to a public employee in cases such as *Pickering*, deciding that the state's interest under the employee cases balancing test dropped out because of the terminated employment relationship. *Benson I*, 734 F.2d at 1186.

Looking to *Benson I* as a statement of existing first amendment law, however, is dubious. In deciding that "at least on the present record" at the summary judgment stage the defendants were not entitled to qualified immunity for allegedly denying legal representation because of the plaintiff's first amendment activities, this court cautioned that it was reaching no conclusion on the merits of the case and invited the defendants to "establish that they would have reached the same decision not to reimburse Benson even in the absence of protected conduct" as directed by *Mt. Healthy*. *Id.* On remand the defendants were unable to do this, and, in a subsequent appeal, the *Benson II* court noted that the defendants now acknowledged that their actions were primarily motivated by Benson's first amendment activities. 786 F.2d at 277 n. 19. With improper motivation established by the defendants' admission the *Benson II* court cited *Benson I* for the proposition that the alleged retaliatory actions were violative of clearly es-

tablished law; therefore, the defendants were not entitled to a qualified immunity. *Id.* at 276–77 & n. 19. Thus, for the purposes of the *Benson* cases, *Benson I* provided a very general statement of first amendment law in 1984: denying legal representation to a former employee, admittedly motivated by retaliation for the employee's complaints to the press, violates the first amendment.

However, the rule's effect reaches no further. The procedural posture of the *Benson* cases, including the defendant's admission of motivation, lead to the *Benson I* rule. Further the factual dissimilarities between *Benson I* and the case at bar are great; for example, facts showing legitimate reasons for acting were not before the *Benson* courts. The non-public employee portions of the 1984 *Benson I* opinion or the 1986 *Benson II* opinion do not show that the alleged violation in the present case was clearly established in 1981.

What the remaining parts of the *Benson* cases, those portions regarding persons with public employee status, do illustrate is the proper approach to qualified immunity cases where an officer or official must *balance* competing factors in deciding whether to act in a situation where first amendment interests may be at stake. We find the *Benson II* court's reasoning in the public employee balancing test context, *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), applicable to the context here, where an officer must balance an infringement of first amendment interests against proper law enforcement interests:

> [T]here is one type of constitutional rule, namely that involving the balancing of competing interests, for which the standard may be clearly established, but its application is so fact dependent that the "law" can rarely be considered "clearly established." ... It would appear that whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under [*Harlow*]. With *Harlow's* elimination of the inquiry into actual motivations of the official,

qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required.[18]

....

---

[18] There may, of course, be a situation in which the defendant's actions are so egregious that the result of the balancing test will be a foregone conclusion, even though prior caselaw may not address the specific facts at issue.

*Benson II*, 786 F.2d at 276 & n. 18 (citations omitted). *Accord Powers v. Lightner*, 820 F.2d 818, 823–24 (7th Cir.1987) (Flaum, J., concurring), *cert. denied,* — U.S. ——, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988).

The *Benson II* reasoning is sound and recognizes both the difficulty in such balancing acts and the reach of qualified immunity: to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). It cannot be said that an imperfect balancing resulting, on hindsight, in a decision on the wrong side of the scales shows plain incompetence or total disregard, unless, of course, the proper balance was clearly illuminated by the light of existing law. Here, the officers, arguably, may have faced a decision that required such a balancing, and it is clear to us that their resolution of the contradictory factors before them showed neither plain incompetence nor total disregard of Rakovich's first amendment rights. But even if we ignore this sound reasoning and choose not to use the "closely conforms" language of *Benson II*, the result would be the same. Utilizing the "closely analogous" language of *Powers v. Lightner* or even language that equates with an even less demanding conformity, our research has not turned up cases that equate with the factual situation here. Therefore, the conclusion is inescapable that it was not clearly established in 1981, nor even now, that the officers' particular conduct violated clearly established law. The district court should have determined that the officers were qualifiedly immune.

This is not a decision that the officers infringed no first amendment interests of Rakovich, but is instead a decision that, whether or not such an infringement occurred, a reasonably well-trained officer could believe that his conduct did not violate a clearly established right. In other words, viewing it in a light most favorable to Rakovich, officers of "reasonable competence could disagree," *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096, and "in the light of the preexisting law the unlawfulness [was not] apparent," *Anderson,* 107 S.Ct. at 3039. We do not suggest, however, that the actions of the officers in the particular circumstances were in any way unlawful. *See Bailey v. Andrews,* 811 F.2d 366, 370 (7th Cir.1987). We need not rest our decision only on our earlier factual determination that retaliatory motive was not demonstrated because the officers clearly are qualifiedly immune. We reverse the district court's denial of the officers' motion for directed verdict.

### III. CONCLUSION

Rakovich marshalled all of his efforts at trial to demonstrate retaliation. Relitigating the issues properly under a *Mt. Healthy* or a *Harlow* analysis would produce no new information, only place it in a different structure. We have done that, obviating any reason to remand to the district court to do the same thing. Both the proper scope of appellate review and the complete and detailed trial record dictate that this case deserves to end here.

REVERSED.

FLAUM, Circuit Judge, concurring.

I concur in section II C of the majority's thorough opinion which addresses the question of the appellants' qualified immunity. I agree with Judge Wood's well-reasoned analysis that applying the correct legal standards the officers are immune from liability to Rakovich under § 1983. I would therefore reverse the district court's denial of the appellants' motion for a directed verdict on qualified immunity grounds.

With regard to the issue of the officers' right to either a directed verdict or a judgment notwithstanding the verdict, I would not find it necessary to address this very close question. Viewing the evidence and all reasonable inferences therefrom in the light most favorable to Rakovich (the non-moving party) it may well be that reasonable jurors could differ over whether the officers unlawfully retaliated against Rakovich for the exercise of his first amendment rights.

Respectfully, I therefore join only the portion of the majority opinion that holds that the appellants are entitled to a directed verdict based on qualified immunity.

CUDAHY, Circuit Judge, dissenting:

I respectfully dissent, adopting Judge Ripple's fine opinion for the panel in this case, 819 F.2d 1393 (7th Cir.1987). The only close question here, it seems to me, is the matter of qualified immunity. The jury properly determined that this is a case of retaliation for the exercise of first amendment rights. That retaliation of this sort violates the Constitution is hardly an esoteric matter (distinguishing this case from the technical fourth amendment violations addressed in *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Hence, I believe the right violated was "clearly established" in a sufficiently particularized way.

RIPPLE, Circuit Judge, dissenting.

Justice Holmes, addressing the tendency of "[g]reat cases like hard cases [to make] bad law," further elaborated on the danger when "some accident of immediate overwhelming interest ... appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." *Northern Sec. Co. v. United States,* 193 U.S. 197, 400–401, 24 S.Ct. 436, 468, 48 L.Ed.2d 679 (1904) (Holmes, J., dissenting). "If 'hard cases make bad law,' unusual cases surely have the potential to make even worse law." *Department of the Air Force v. Rose,* 425 U.S. 352, 382, 96 S.Ct. 1592, 1609, 48 L.Ed.2d 11 (1976)

(Burger, C.J., dissenting). This is certainly not a "great case." It is, however, a "hard case;" it was tried poorly and therefore does not present to this court the clean, crisp record necessary for accurate appellate adjudication. It is also an unusual case; fortunately, in most American communities, cooler heads prevail at an earlier stage and the provincial, petty, political bickering that forms the basis of this litigation does not end up in federal court.

It is quite understandable, therefore, that a case such as this one would produce the kind of "hydraulic pressure" of which Justice Holmes spoke. The parties and their counsel have brought to both the proceedings of this court and the proceedings of the district court more passion than reason. The court is also understandably concerned about the result in the district court. The imposition of a civil monetary judgment on a state law enforcement officer is harsh medicine and ought to be imposed only in accordance with settled principles of law. While it is understandable that such a hard and unusual case produces "hydraulic pressure," we cannot, I respectfully submit, allow the rest of Justice Holmes' observation to become a reality. What has previously been clear must not now become doubtful; settled principles of law must not bend to the exigencies of the moment.

Unfortunately, the effect of this hydraulic pressure is easily observable in the court's methodology. Rather than remain within its proper role as an intermediate appellate court, the court first intrudes on the fact-finding responsibilities of the jury and then frustrates the governing test for qualified immunity carefully forged by the Supreme Court. *See generally* Murphy, *Lower Court Checks on Supreme Court Power*, 53 Am.Pol.Sci.Rev. 1017 (1959). In the first part of its opinion it holds—or appears to hold—that the record will not support the plaintiff's claim of retaliation. It reaches this conclusion by disregarding the usual limitations on the scope of appellate review of factual findings. *See Jefferson Nat'l Bank v. Central Nat'l Bank*, 700 F.2d 1143, 1156 (7th Cir.1983) ("It is the fact finders' function to hear and observe the witnesses and to weigh the conflicting evidence. On appeal, we are not to decide a case based on what we, as individual judges, would have decided under the same or similar circumstances."); *cf. Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). Indeed, the court makes a better case for the defendants than do the defendants. The second part of the court's opinion stands in curious juxtaposition to the first part. The court now either assumes or concedes that the plaintiff presented sufficient evidence to require a jury determination of his retaliation claim. Disregarding the sharp disagreement between the parties with respect to the facts, it then proceeds to hold that the defendants are entitled to qualified immunity.

At this stage of the litigation, it makes little sense to increase the pages in this court's reports by restating the facts and arguing for a characterization of those facts compatible with the jury verdict. Even the casual reader of our decisions will recognize that the methodology employed here is a significant departure from this court's usual approach when asked to review the factual basis of a jury verdict in a civil case. *See Jefferson*, 700 F.2d at 1156; *see also* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2524 at 543–44 (1971). Indeed, even those members of the bar who regularly practice criminal law, where the standard of proof is more stringent, see *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), will be able to recall few cases where this court's scrutiny of the factual basis for the verdict has been quite so exacting.

It is important, however, to spend some time reviewing the court's substantive treatment of the qualified immunity issue. Here, to paraphrase Justice Holmes, set-

tled principles of law have been bent and the possible impact on the future protection of first amendment rights is substantial. At the outset, I emphasize that there is no dispute over many basic principles. The court correctly states that the claim of qualified immunity must be evaluated against an objective standard. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The proper inquiry is whether the prison officials violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* It is also true that the right allegedly violated may not be asserted at any level of generality. Rather,

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson v. Creighton,* — U.S. —, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

It is in the application of this last principle that the court's approach encounters fatal difficulty. In its attempt to justify its result, the court presents, successively, two distinct analyses. First, the court analogizes the situation to the one that confronted the court in *Benson v. Allphin,* 786 F.2d 268 (7th Cir.1986). There, the defendant public officer, dealing with a public employee discharge situation, had to "arrive at a balance between the interests of the plaintiff, as citizen, in commenting on matters of public concern and the interests of the state, as employer, in promoting the efficiency of the public service it performs through its employees." *Id.* at 276. This approach, concludes the court, is likewise applicable in this present context "where an officer must balance an infringement of first amendment interests against proper law enforcement interests." This characterization of the present case requires, of course, the court's protestations notwithstanding, that the plaintiff's version of the case be revised factually. It ignores totally the possibility that one motivation—re-

taliation—was the reason for the defendants' action. Or, if we assume a dual motive, it disembowels completely the Supreme Court's holding in *Mt. Healthy School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Apparently, at least in the Seventh Circuit, any evidence that official action restricting first amendment rights was prompted by a permissible governmental reason will be sufficient to remove the case from the jury's consideration—even when there is evidence that the government's action was prompted largely by an impermissible motivation to inhibit protected speech.

The court's alternate approach to the " 'clearly established' in a more particularized ... sense" requirement of *Anderson,* 107 S.Ct. at 3039, creates even more concern for the protection of first amendment rights. The court determines that there is an absence of "closely analogous" case law because most cases concerning retaliation for first amendment rights involve public employee discharges, surveillance of political groups and organizations, or the arrest of persons on the explicit ground that they exercised first amendment rights. These situations, it summarily concludes, do not "equate with the factual situation here."

This conclusion ignores the explicit mandate of *Anderson,* where the Supreme Court said: "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent." 107 S.Ct. at 3039 (citation omitted). In short, while closely analogous case law, decided before the defendant public official acted, is always relevant, it must be acknowledged that precise factual congruity cannot be expected and is not necessary. What is important is that the law be sufficiently explicit and well-settled that "the unlawfulness must be apparent." *Id.*

It is hardly a novel proposition of American constitutional law that a law enforcement officer may not utilize the criminal process in order to punish a citizen for the

exercise of first amendment rights. Not only does the average American law enforcement officer understand this basic proposition, the average American third grader does as well. The court's approach to the need for "closely analogous" case law sends a clear message to those officials, hopefully small in number, who are willing to use their power to inhibit freedom of speech: Choose a novel approach to your abuse of power. Avoid a *modus operandi* that someone has tried before. Create a verbal smokescreen by articulating fabricated justifications for your actions. Then, when you are sued, point to the fact that there has never been a case like yours.

*Anderson* struck a healthy balance between the need to protect individual freedom and the necessity of protecting the public official from liability for actions he could not have known were contrary to law. Today, this circuit departs significantly from that approach and distorts that precedent. Our obligation is to apply the law of the Supreme Court—not to bend it to fit our own predilection. Law enforcement officers now have little to fear, at least in this circuit, from civil rights suits; fortunately, lower court judges must still fear the writ of certiorari.