**Robert JOHNSON, by and on behalf of himself, and Robert J. JOHNSON, a minor, and Jamir M. Johnson, a minor, Plaintiffs–Appellants,**

v.

**Charlene COLLINS and Pamela Mannie, Defendants–Appellees.**

**No. 99–2950.**

United States Court of Appeals, Seventh Circuit.

Submitted Feb. 22, 2001.\*

Decided Feb. 23, 2001.

Rehearing Denied April 4, 2001.

---

\* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before Hon. BAUER, Hon. CUDAHY, and Hon. POSNER, Circuit Judges.

## ORDER

This appeal arises from the unfortunate abuse of Robert Anthony Johnson's two children at the hands of the boyfriend of their mother, Carla Eason. Johnson sued two Illinois Department of Children and Family Services caseworkers, alleging a variety of constitutional violations under 42 U.S.C. § 1983 and several supplemental state law claims, all stemming from actions taken by the caseworkers during proceedings in the Child Protection Division of the Circuit Court of Cook County, Illinois. The district court dismissed Johnson's complaint for lack of jurisdiction pursuant to the *Rooker–Feldman* doctrine. We vacate the decision of the district court and remand the case for further proceedings consistent with this order.

We take the following factual account from the plaintiffs' complaint as true, as we must on review of a motion to dismiss. Johnson and Eason were never married, but they had two children, Robert Jamal Johnson and Jamir Malik Johnson. When the events that gave rise to this appeal took place, the children were living with Eason and her live-in boyfriend, Terrence Miller. Johnson had visitation rights with the children, who were three and two years old respectively.

In June 1995 Johnson noticed bruises on Jamir, and took him to the hospital. Hospital staff thought that Jamir's injuries were suspicious, and called the Illinois Department of Children and Family Services ("DCFS"). Because Eason could not satisfactorily explain the injuries, DCFS placed both children in protective custody on June 23, 1995. On June 26, 1995, a Cook County, Illinois circuit court held a temporary custody hearing at which both Johnson and Eason were present. Based on the unexplained bruising, the court found probable cause that the children were abused, neglected or dependant, and awarded temporary custody with a right of placement to the DCFS Guardianship Administrator. The court did not specify where or how DCFS should place the children.

Pamela Mannie, a DCFS caseworker supervisor, placed Robert and Jamir with their maternal grandmother as a foster parent. But according to Johnson, Mannie was aware that the grandmother was mentally unstable and unable to care for the children. The grandmother in fact suffered an emotional breakdown shortly after the children were placed with her, and she thereafter neglected the children's medical needs. Further, she allowed Eason and Miller to have unsupervised visits with Robert and Jamir. Because the grandmother believed that she was unable to care for the children's needs, she met with unidentified family members to discuss how possible psychiatric treatment would affect her ability to care for the children. After this meeting, the grandmother, due to her psychological condition, asked Mannie to relocate the children, presumably with another family member. Mannie, however, warned the grandmother that if the court were made aware of her psychological problems the children would be placed in a foster home outside of the family. For this reason, Mannie encouraged her to "deal with the situation as best she could," and the grandmother kept the children.

Some time later, the grandmother became unable to cope with the children's emotional and medical needs, and was admitted to what Johnson identified simply as a "psychiatric ward." Thereafter, she sent the children back to Eason. Mannie was aware that the children were again living with Eason despite the court order removing them from her custody. After the grandmother sent the children to Eason, Miller continued to abuse the children.

During the children's placement with the grandmother, they received no medical care, dental care, therapy or counseling. Mannie and another DCFS caseworker, Charlene Collins, were aware that the children had been medically neglected and required medical care. Despite the caseworkers' failure to secure medical care for the children, they falsely told Johnson, his attorney, and the state court that the children received adequate medical care.

At a hearing on November 17, 1995, the state court entered dispositional orders in the children's proceedings. The court found that Eason was "fit, able and willing to care for, protect, train and discipline the children." The court terminated DCFS's temporary custody of the children and returned custody to Eason. Additionally, the court entered orders of protection directed at Eason, which, among other things, required Eason to provide the children with medical care and ensure that the children had no contact with Miller.

After Eason regained custody, Mannie and Collins facilitated Eason's contact with Miller, despite the court's November 17 protective order. First, Mannie and Collins helped Eason find housing only four blocks away from Miller–housing that Mannie and Collins knew was owned by Miller's cousin. Moreover, Mannie and Collins later became aware that Miller returned to live with Eason in violation of the court's November 17 order, and yet they did nothing. Between November 17, 1995 and June 11, 1996, Mannie and Collins failed to monitor Robert and Jamir, even though several unidentified individuals told them that Miller was again abusing the children. In addition, Johnson himself reported to Collins that Eason was living with Miller in violation of the November 17 protective order, and that Miller was abusing Robert and Jamir. Collins and Mannie concluded that Johnson's reports of abuse were unfounded, and told him that he was harassing Eason through his charges that Miller was abusing the children. Mannie and Collins told Johnson that the case was "nonsense," that he was jealous of Miller, that his complaints placed them in the middle of a custody dispute, and that they never believed any abuse had occurred. Moreover, Mannie and Collins submitted false medical reports to the juvenile courts showing that the children were receiving appropriate medical care and therapy.

In June 1996 the grandmother noticed that Jamir had hurt his arm. After she unsuccessfully tried to convince Eason or DCFS to take Jamir to the hospital, the grandmother herself took the boy to the hospital. Doctor John Lyon of Evanston Hospital examined Jamir and noted that the boy had suffered two broken arms, but had not been brought for treatment until "sometime after the injury occurred." Dr. Lyon told Johnson that it was "beyond his comprehension" how the injuries went unnoticed by DCFS, and that Jamir had suffered "an extreme amount of pain as his arm attempted to grow and heal over a six month period without medical intervention." Another doctor at the hospital reported on June 8, 1996 that both children had suffered numerous incidents of physical abuse and were medically neglected (though Johnson does not specify any injuries Robert suffered).

On June 11, 1996, the guardian *ad litem* for the children (who had been appointed at the beginning of the proceedings) presented a motion in the state court for temporary custody, and the court granted the DCFS Guardianship Administrator temporary custody with the right to place the children. Three days later, the court approved DCFS's request to place the children with their paternal grandmother.

Shortly thereafter, Johnson received a letter from Jess McDonald, Director of DCFS. The letter contains an apology from Jess McDonald "for the last correspondence you received from my office," and admits that "information relayed to us was inaccurate." McDonald proceeded to discuss the change in Robert's and Jamir's cases, noting that Eason and Miller were facing criminal charges and that DCFS would recommend that Johnson receive custody of both boys. After receiving this letter, Johnson inquired whether Mannie or Collins would be disciplined, but he heard nothing. Johnson then wrote a letter to then-United States Senator Carol Moseley–Braun complaining about his treatment by DCFS and how DCFS treats non-custodial fathers.

After Johnson sent his letter, Collins and Mannie allegedly retaliated against him. According to Johnson, Collins and Mannie traveled from Illinois to Wisconsin (where Johnson resided), purportedly to investigate allegations of abuse, and allegedly threatened Johnson and his family, saying that "[w]e can play hard ball, too." Further, Collins and Mannie convinced Wisconsin authorities to make four separate visits to Johnson's residence, two of which occurred in the middle of the night. Finally, Collins and Mannie also submitted requests that Johnson complete a counseling program, despite the fact that he had already completed that program.

On January 8, 1997, the state court awarded custody of the children to Johnson, and the proceedings were ordered closed. At the end of February 1997, the DCFS Inspector General dismissed an investigation into Collins and Mannie based on misrepresentations that the caseworkers allegedly made about the case to the Inspector General. Johnson then filed this lawsuit.

The parties consented to proceedings before a magistrate judge. The district court proceeded to group Johnson's multiple allegations into three claims for relief: 1) a substantive due process claim for denial of the children's right to suitable foster care; 2) a substantive due process claim for the denial of the children's right to basic medical care; 3) a First Amendment claim that Mannie and Collins retaliated against Johnson for filing administrative complaints against them. The district court concluded that the claims were barred by the *Rooker–Feldman* doctrine because the issues were "inextricably intertwined with issues previously decided by the juvenile court" and could not be separated from "the ongoing juvenile court orders which involved determinations that the minors were abused, that temporary custody should be given to DCFS, and that the minors should be returned to their mother under an order of protection." Accordingly, the court found that it lacked jurisdiction to hear Johnson's claims and dismissed his complaint. In the alternative, the district court held that even if *Rooker–Feldman* did not bar Johnson's retaliation claim, the defendants were entitled to qualified immunity because Johnson did not allege a constitutional violation.

■ We review de novo a district court's dismissal of an action for lack of subject matter jurisdiction. *See Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir.1999). In addition, when reviewing a dismissal for lack of subject matter jurisdiction, we, like the district court, must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Id.*

■ On appeal, defendants concede, correctly we believe, that the district court erred in dismissing plaintiffs' claims under the *Rooker–Feldman* doctrine because most of plaintiffs' claims did not require

the district court to review the state court orders. The *Rooker–Feldman* doctrine holds that only the United States Supreme Court has jurisdiction to review a final judgment of a state court. *See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The doctrine applies not only to claims that were actually raised before the state court, but also to claims that are inextricably intertwined with state court determinations. *Ritter v. Ross,* 992 F.2d 750, 753 (7th Cir.1993). The key inquiry is "whether 'the district court is in essence being called upon to review the state-court decision.'" *Ritter,* 992 F.2d at 754 (quoting *Feldman,* 460 U.S. at 483–84 n. 16, 103 S.Ct. 1303). To the extent that plaintiffs alleged that the state court erred in awarding custody of the children to DCFS and then to Eason, these claims are barred by the *Rooker–Feldman* doctrine because they would require the district court to evaluate the propriety of the state court custody orders. *See T.W. by Enk v. Brophy,* 124 F.3d 893, 898 (7th Cir.1997). Likewise, to the extent that the plaintiffs claim that Jamir never would have suffered a broken arm if the state court had not awarded custody to Eason on November 17, 1995, this claim is foreclosed because *Rooker–Feldman* bars claims that allege injuries caused by state court judgments. *See Young v. Murphy,* 90 F.3d 1225, 1231 (7th Cir.1996).

But as defendants acknowledge, not all of plaintiffs' claims before the district court challenged the propriety of the state court's custody determinations. Several of plaintiffs' claims alleged injuries caused by the defendants' own actions during the custody proceedings. *Cf. Holloway v. Brush,* 220 F.3d 767, 778–79 (6th Cir.2000) (*Rooker–Feldman* did not bar § 1983 suit brought by mother against social worker

for providing false information both to her and to court during custody proceedings; court was asked not to review the custody decision, but instead whether actions taken during custody proceedings "may have involved a violation of [the mother's] federal constitutional rights for which the responsible party may be held liable for damages"). Plaintiffs assert that their injuries were caused by defendants' failure to follow the state court's orders. For example, Johnson claimed that, *despite* a state court order directing them to do otherwise, the Collins and Mannie failed to secure medical care for Robert and Jamir while the boys were in DCFS custody. Further, Johnson claimed that Collins and Mannie knowingly placed the boys with a foster parent–the maternal grandmother–who could not adequately care for their needs; that the boys were injured by this placement; and that Collins and Mannie knew that the grandmother could not care for the boys. Johnson also alleged that Collins and Mannie knew that the grandmother allowed Eason to visit the boys and that she ultimately returned them to Eason. But instead of informing the court of the grandmother's problems (and the violation of the temporary custody order), Collins and Mannie told the foster parent to "deal with the situation as best she could." Similarly, plaintiffs claimed that Jamir's broken arms resulted from the caseworkers' failure either to secure medical care for him or to report Eason's violation of the protective order. Finally, Johnson alleged that Collins and Mannie retaliated against him, for complaining to Senator Moseley–Braun; this allegation has nothing to do with any state court order. Accordingly, the plaintiffs' claims are not inextricably intertwined with the state court decision, and the district court should not have dismissed the complaint under *Rooker–Feldman* for lack of jurisdiction.

■ Even though plaintiffs' claims are not barred by *Rooker–Feldman,* the district court never addressed whether Johnson could bring this suit pro se on behalf of his children. To maintain a suit in a federal court, a child or mental incompetent must be represented by a competent adult, ordinarily a parent or relative. *See T.W. by Enk,* 124 F.3d at 895; Fed. R.Civ.P. 17(c). But though Johnson may bring this suit on the children's behalf, he may not do so without counsel. *Collinsgru v. Palmyra Bd. of Educ.,* 161 F.3d 225, 231 (3d Cir.1998); *Wenger v. Canastota Cent. Sch. Dist.,* 146 F.3d 123, 125 (2d Cir.1998); *Johns v. County of San Diego,* 114 F.3d 874, 876 (9th Cir.1997); *Cheung v. Youth Orchestra Found. of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir.1990); *Meeker v. Kercher,* 782 F.2d 153, 154 (10th Cir.1986) (per curiam); *see also Lewis v. Lenc–Smith Mfg. Co.,* 784 F.2d 829, 830 (7th Cir., 1986)(person not licensed to practice law may not represent another individual in federal court). Because the choice to appear pro se is not a "true choice" for minors who cannot determine their own legal actions, minors are entitled to trained legal assistance so that their rights may be fully protected. *See Cheung,* 906 F.2d at 61. Therefore, the district court should have dismissed the children's claims without prejudice. *See Johns,* 114 F.3d at 878; *see also Osei–Afriyie v. Medical College of Pa.,* 937 F.2d 876, 883 (3d Cir.1991) (vacating judgment entered against children and suggesting on remand that plaintiff may secure counsel for children, that children's claims may be dismissed with prejudice, or that district court may exercise discretion pursuant to 28 U.S.C. § 1915(d) to appoint counsel for children).

■ This leaves only one federal constitutional claim–Johnson's claim that Mannie and Collins retaliated against him (by threatening to play "hard ball" with him, causing middle-of-the-night visits to his Wisconsin residence, and submitting reports to Wisconsin administrators recommending that Johnson repeat a counseling class) after he filed an administrative complaint regarding their handling of his children's cases. The district court found that, even if Johnson's retaliation claim was not barred by *Rooker–Feldman,* defendants were entitled to qualified immunity because Johnson had not experienced a "worsened condition" and so had not alleged an injury resulting from a constitutional violation.

Qualified immunity protects government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To evaluate a claim of qualified immunity, we engage in a two-step analysis. First, we determine whether the plaintiffs' claim states a violation of their constitutional rights. Second, we determine whether those rights were clearly established at the time the violation occurred. *Jacobs v. City of Chicago,* 215 F.3d 758, 766 (7th Cir.2000). As to the first step, Johnson's claim before the district court alleged that Collins and Mannie violated his First Amendment rights by retaliating against him for complaining to Senator Moseley–Braun about them. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see also Gagliardi v. Village of Pawling,* 18 F.3d 188, 194–195 (2d Cir.1994)(plaintiffs stated a claim by alleging that defendants purposefully refused to enforce applicable zoning, noise, and safety ordinances in retaliation for prior complaints about zoning violations). As for the second step, these rights were clearly established at the time the violation occurred. *See, e.g., Rakovich v. Wade,* 850 F.2d 1180, 1189 (7th Cir.1988) (noting that

an investigation conducted in retaliation for comments protected by the First Amendment could be actionable under § 1983).

To establish his retaliation claim, Johnson must have alleged a "chronology of events from which an inference of retaliation may plausibly be inferred." *Zimmerman v. Tribble,* 226 F.3d 568, 573 (7th Cir.2000). Because there is no justification for harassing people for exercising their constitutional rights, the injury alleged by Johnson need not be great in order to be actionable. *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). Collins and Mannie claim that Johnson's injury is de minimis because he received custody of his children merely a short time later and, furthermore, their own conduct is "innocuous." But defendants' conduct can hardly be characterized as "innocuous." They threatened to play "hard ball" with Johnson, and then made good upon that threat by twice awakening him in the middle of the night and subjecting him to fear of continued custody struggles with DCFS. A reasonable factfinder could conclude from this chronology of events that Johnson stated a claim of retaliation. *Cf. Bart,* 677 F.2d at 625 (public employee who had espoused certain views while running for office stated a claim against mayor for retaliation based on an alleged "campaign of petty harassments" that included including baseless reprimands and ridicule).

For the foregoing reasons the judgment of the district court is VACATED and the case REMANDED for further proceedings consistent with this order.